**C. Jeffrey DICKISON, Appellant–Plaintiff,**

v.

**Clay HARGITT and Susan Moody, Appellees–Defendants.**

No. 32A01–9208–CV–258.

Court of Appeals of Indiana, First District.

April 6, 1993.

David W. Craig, J. Michael Pingleton, Wright & Craig, Indianapolis, for appellant-plaintiff.

William H. Kelley, Bunger, Robertson, Kelley & Steger, Bloomington, for appellees-defendants.

BAKER, Judge.

Plaintiff-appellant C. Jeffrey Dickison appeals the trial court's entry of judgment on the evidence in favor of defendant Susan Moody and defendant-appellee Clay Hargitt. The trial court took the case away from the jury because it concluded Dickison utterly failed to make his case, and that moreover, Dickison's own conduct precluded his recovery as a matter of law. Dickison challenges these conclusions.

## FACTS

On July 15, 1990, after drinking several beers and smoking some marijuana, Dickison found himself on the upstairs balcony of his friend, Susan Moody. Feeling romantically inclined, he took a step toward Moody to kiss her, but slipped on some twigs or branches littering the balcony floor. As he slipped, he clutched the balcony's twenty-seven-inch high wooden railing. The rail failed. Both he and Moody, who

had grabbed him to prevent his fall, tumbled to the ground below. Dickison suffered a fractured skull and scapula, a concussion, a broken nose, and lost his sense of smell and impaired his sense of taste.

Two days after the accident, one of Dickison's friends, Pat Johnston, examined the railing. The wood was no good. It had a lot of rot. Johnston took photographs and collected a small sample of the rotted wood. Johnston testified at trial that although the railing's insides were rotted, the only outward manifestation of this condition was in the form of a few darkened areas near the joints. It was also discovered there were water trailings directly below the balcony. But other than needing a coat of paint, the railing looked fairly safe. Indeed, Moody had leaned on it previously without incident.

Further testimony disclosed that Moody's landlord, Clay Hargitt, had inspected Moody's half of the duplex at least twice previously and had specifically told Moody to be careful while she was on the balcony. Hargitt, who holds a civil engineering degree, owns a residential construction business, has refurbished balconies in the past, and holds himself out to be knowledgeable about the general condition of wood, admitted he knew the balcony railing was made of pine, a softer wood more prone to water damage. He conceded wood was treated to prevent water damage, and that he had not treated the railing during the one year or so he had owned the duplex. He consistently denied having any knowledge of the railing's poor condition, however.

After hearing the evidence, the trial court granted Moody's and Hargitt's motions for judgment on the evidence under Ind.Trial Rule 50. It ruled Dickison failed to present a *prima facie* case of negligence, and that Dickison's own conduct precluded any recovery. Dickison appeals.[1] In addition to challenging the trial court's justifications, Dickison argues the evidence he presented showed Hargitt breached an obligation to repair the balcony.

---

**1.** Dickison has declined to pursue Moody on appeal.

## DISCUSSION AND DECISION

### Standard of Review

When assessing the propriety of the trial court's decision to grant judgment on the evidence, we employ the same standard of review as the trial court. Both we and the trial court must consider only the evidence and its reasonable inferences most favorable to the non-moving party. *Sipes v. Osmose Wood Preserving Co. of America, Inc.* (1989), Ind., 546 N.E.2d 1223, 1224; *Richardson v. Marrells's, Inc.* (1989), Ind.App., 539 N.E.2d 485, 486, *trans. denied.* To affirm the grant of judgment on the evidence, the evidence must support inferences favorable only to the moving party. *Sipes, supra.* "If there is any probative evidence or reasonable inference to be drawn from the evidence or if there is evidence allowing reasonable people to differ as to the result, judgment on the evidence is improper." *Id.* The idea underlying this standard of review, of course, is to guarantee a litigant's right to have conflicting evidence submitted to a jury for resolution. *Cooper v. Teeters* (1969), 146 Ind.App. 150, 153, 253 N.E.2d 277, 279.

### I

### Did Dickison Establish a Prima Facie Case of Negligence?

Dickison's primary theory of liability was negligence on the part of Hargitt, the landlord. To establish a *prima facie* case, Dickison had to present admissible evidence that Hargitt owed him a duty, that the duty was breached, and that the breach proximately caused his injury. *Flott v. Cates* (1988), Ind.App., 528 N.E.2d 847, 848. The trial court specifically held Dickison failed on each count.

### Duty To Warn

At common law, landlord and tenant relations were governed by ordinary principles of contract law; the letting of the premises was treated as a sale of a chattel interest in the property. *See* 49 Am.Jur.2d *Landlord and Tenant* § 1. A tenant who had the opportunity to inspect the premises before accepting them was considered to have accepted the premises in their existing condition, and having done so, usually could not later complain about a defect. *Id.,* § 780. This policy, known as *"caveat lessee,"* or "let the lessee beware," has been adopted in Indiana and has been summarized as follows: a landlord who gives a tenant full control and possession of the leased property generally will not be liable for personal injuries sustained by the tenant or other persons lawfully upon the leased property. *Pitcock v. Worldwide Recycling, Inc.* (1991), Ind.App., 582 N.E.2d 412, 415.

The law makes allowances for those circumstances which render strict adherence to the general rule of *caveat lessee* irrelevant, unduly harsh, or even downright foolish. If, for example, a landlord knows of a hidden defect unknown to the tenant, the landlord may incur liability if by reason of his failure to warn of the hidden defect a tenant suffers an injury. *Stover v. Fechtman* (1966), 140 Ind.App. 62, 67, 222 N.E.2d 281, 284. Additionally, if a landlord agrees to repair the premises and either fails to do so or repairs negligently, he may face liability for injuries sustained on account of his failure. *Flott supra,* at 848; *Hunter v. Cook* (1971), 149 Ind.App. 657, 660-61, 274 N.E.2d 550, 552. Dickison relies on both of these exceptions to establish Hargitt owed him a duty relating to the defective railing. That a landlord owes his tenants' social guests the same duty as the landlord owes his tenants is not disputed. *Hodge v. Nor–Cen, Inc.* (1988), Ind.App., 527 N.E.2d 1157, 1161, *trans. denied.* Whether a defendant owes a plaintiff a duty is a question of law, although questions of fact may be interwoven into this determination. *Gunter v. Village Pub* (1993), Ind.App., 606 N.E.2d 1310, 1312.

This court has often repeated the exception that a landlord has a duty to warn the tenant of hidden defects known to the landlord but unknown to the tenant. *See Rogers v. Grunden* (1992), Ind.App., 589 N.E.2d 248, 255, *trans. denied; Pitcock, supra* at 415; *Hodge, supra,* at 1160; *Zimmerman v. Moore* (1982), Ind.App., 441

N.E.2d 690, 693–94; *Guenther v. Jackson* (1922), 79 Ind.App. 127, 133, 137 N.E. 582, 584; *Roehrs v. Timmons* (1902), 28 Ind. App. 578, 581, 63 N.E. 481, 482. Because none of these cases squarely addressed the issue of the landlord's knowledge, it bears repeating that the hidden defect exception to the rule of *caveat lessee* requires *actual* knowledge of the hidden defect on the landlord's part before a duty to warn of the defect arises. It is not enough that the landlord should have known of the hidden defect. No duty to warn arises and no liability accrues if the landlord is without actual knowledge of the latent defect. *Zimmerman, supra,* at 694.

The requirement of actual knowledge is consistent with the common law, which held that landlords were not liable for injuries caused by hidden defects unless the landlords acted fraudulently. It appears the requirement of actual knowledge developed because actual knowledge was commonly regarded as an essential element of fraud. *See* Annotation, *Modern Status of the Rule Requiring Actual Knowledge of Latent Defect in Leased Premises as Prerequisite to Landlord's Liability to Tenant Injured Thereby,* 88 A.L.R.2d 586 (1963) (noting the majority of jurisdictions considering the matter still require actual knowledge before a duty to warn arises). To hold otherwise renders the landlord a guarantor of the tenant's premises, a policy this jurisdiction has rejected under the belief that "[o]ne who lacks possession and control of property normally should not be held liable for injuries which he is no longer in a position to prevent." *Zimmerman, supra,* at 694. It is the relinquishment of control that underlies the justification for requiring actual knowledge in the landlord-tenant context but only constructive knowledge in the premises liability context.

■ Whether a landlord has actual knowledge of a hidden defect is plainly a question of fact for the jury's determination. "Determination of an actor's actual knowledge requires the trier of fact to resort to reasonable inferences based upon examination of surrounding circumstances to reasonably infer its existence." *Gariup*

*Construction Co. v. Foster* (1988), Ind., 519 N.E.2d 1224, 1230 (holding that IND. CODE 7.1–5–1–8, which makes it unlawful for a person to provide alcohol to another when the provider "knows that the other person is intoxicated," requires proof of actual, not constructive, knowledge). This is the case even in the absence of a party's admission of actual knowledge. *Beckett v. Clinton Prairie School Corp* (1987), Ind., 504 N.E.2d 552, 555 (recognizing "the viability of the [incurred risk] defense would be subverted if a plaintiff's denial of actual knowledge were unassailable, automatically insulating the plaintiff").

Dickison argues the trial court was presented with enough facts and reasonable inferences to allow the jury fairly to find 1) a hidden defect existed, and 2) Hargitt had actual knowledge of the hidden defect. We agree.

Dickison made a facial showing that a hidden defect existed. First, Dickison introduced admissible photographs depicting darkened spots of the railing likely caused by moisture or rot, and he produced the small piece of rotten wood collected by his friend, which he reasonably linked to the railing. This evidence established the existence of a defect. Next, Dickison established the railing appeared normal, albeit in need of a repainting, and that the dark spots were inconspicuous. Neither Moody, he, or any other guest suspected the railing was rotten. This evidence established the defect was hidden and not of the type a tenant might reasonably be expected to discover. *See Stover, supra,* 140 Ind.App. at 67, 222 N.E.2d at 284. Viewed in the light most favorable to Dickison, this evidence established the existence of a condition that was both hidden and defective.

We also agree that based on the facts and reasonable inferences Dickison presented, a jury could have reasonably found Hargitt possessed actual knowledge of the hidden defect. Hargitt was familiar with Moody's residence. He had inspected it twice, once when he bought it the previous year and once with Moody when she became a tenant. Although the railing appeared safe on the whole, parts of it were

discolored. Hargitt acknowledged he possessed a trained eye in matters of the condition of wood. Further, Hargitt told Moody to be careful while she was on the balcony. When viewed most favorably to Dickison, these circumstances give rise to a reasonable inference (but by no means the only one) that Hargitt actually knew the hidden defect existed.[2]

There is yet another reason to believe Hargitt may have actually known a hidden defect existed. Soon after the accident, Hargitt collected the debris and stored it in his garage. In the midst of the discovery process Dickison asked Hargitt to produce the wood. Hargitt's attorney admitted Hargitt possessed the evidence and stated the wood could be viewed at a mutually acceptable time. In the meantime, Hargitt moved residences; during the move, the railing's remains vanished. The failure to produce available evidence raises an inference that the evidence would have been unfavorable had it been produced. *Morris v. Buchanan* (1942), 220 Ind. 510, 519–20, 44 N.E.2d 166, 169.[3]

Because Dickison presented evidence from which a jury could reasonably find Hargitt actually knew of the hidden defect, he made a *prima facie* showing of the existence of a duty to warn under the hidden defect exception to *caveat lessee*. The trial court's conclusion to the contrary was erroneous.

### Breach and Causation

Dickison next argues he made a *prima facie* showing that Hargitt breached his duty to warn of the hidden defect and

that the failure to warn proximately caused his injury.

We first observe it is undisputed that Hargitt did not warn anyone of the railing's defective condition. Thus, if Hargitt owed such a duty, it was breached. Neither are we persuaded that Hargitt met his duty to warn by cautioning Moody to be careful on the balcony. Hargitt's duty, assuming it existed, was to warn of the hidden defects of which he had actual knowledge; his unparticularized statement that Moody should be careful on the balcony did not apprise Moody of the railing's hidden defect and therefore did not fulfill his obligation, if it existed in the first instance.

Dickison also established a *prima facie* showing of proximate causation. When viewed most favorably to the party opposing the entry of judgment on the evidence, the evidence shows that had Dickison been apprised of the railing's defective condition, he would not have crashed through it and fallen to the ground below. Whether Dickison would have refused to walk onto the balcony if he knew the railing was bad and whether he might have fallen off even if the railing was sturdy, like other issues of causation and fault, are factual questions the jury should be allowed to resolve. In any event, Dickison made at least the minimum initial showing that the lack of warning caused his injury.

Because Dickison presented evidence from which a jury could reasonably find Hargitt had a duty to warn of the hidden defect, breached the duty, and, in so doing, proximately caused the injury, Dickison

---

**2.** There is ample evidence Hargitt *should* have known of the railing's defective condition. For example, Hargitt holds a civil engineering degree, owns a residential construction business, and had refurbished old balconies. His half of the duplex had a balcony substantially similar to Moody's. Hargitt conceded the railing was made of pine, which is considered a weaker wood and one prone to water damage, conceded that wood is treated so that water damage may be lessened or avoided, and conceded that he had not treated the railing. We wish to emphasize that what Hargitt should have known is irrelevant to the hidden defect inquiry. The only issue is whether he *actually* knew of the hidden defect.

**3.** We acknowledge the ambiguity the rule may easily engender. For example, does the failure to produce the railing give rise to an inference that the wood was, in fact, rotten, or does it give rise to an inference Hargitt actually knew it was rotten before the accident? Does it give rise to both, or to others? The first inference is relatively harmless here; the second is devastating. Given Dickison's presentation of independent grounds for finding Hargitt actually knew of the hidden defect, however, we need not resolve the difficulty the rule presents under the circumstances of this case.

made his *prima facie* showing of negligence. The trial court erroneously withheld Dickison's negligence case from the jury.

## II

### *Did Hargitt Owe Dickison a Duty to Repair the Railing?*

■ Dickison also argues Hargitt owed him a duty not just to warn of the railing's defect, but to fix it as well. He claims this duty arose by agreement between Hargitt and Moody.

■ Generally speaking, a landlord has no duty to undertake repairs of premises in the tenant's exclusive possession unless the landlord agrees to do so by contract or otherwise. *See Childress v. Bowser* (1989), Ind., 546 N.E.2d 1221; *Great Atlantic & Pacific Tea Co., Inc. v. Wilson* (1980), Ind.App., 408 N.E.2d 144, 147; Restatement (Second) of Torts § 357 (1965). The party seeking to establish the existence of an agreement to repair bears the burden of proving the agreement's existence in the first instance. *See Continental Grain Co. v. Followell* (1985), Ind. App., 475 N.E.2d 318, 321, *trans. denied.* The parties' intent is a factual question for determination by the jury based on the surrounding circumstances. *Id.*

The only evidence probative of the existence of an agreement came from Hargitt's wife, who testified that when Moody had a problem with some aspect of her half of the duplex, Moody called Hargitt and Hargitt repaired the problem. We are not informed how often this occurred or which problems Hargitt remedied. Still, when viewed in the light most favorable to Dickison, the evidence of Hargitt's past repairs raises a reasonable inference of the existence of at least some agreement to repair.

It is reasonable to believe that if a general agreement to repair existed, it may have included a specific obligation to repair the railing. If Hargitt assumed an obligation to repair the railing, it may have been because he knew it was defective and he had agreed to repair those defects of which he had actual knowledge. Alternatively, Hargitt may have assumed the obligation to repair the railing—even if he did not know it was in need of repair—because he agreed to seek out defects and repair them.

Dickison, however, has never suggested Hargitt voluntarily undertook any obligation to search Moody's premises for hidden defects. Accordingly, Dickison's duty to repair argument will either prevail or fail based on whether Hargitt had actual knowledge of the railing's defect. If Hargitt had no actual knowledge of the defect, he cannot be accountable because it is undisputed he was under no obligation to seek out hidden defects. But even if Hargitt did have actual knowledge, he would be obligated to repair only if he agreed to fix those defects of which he had actual knowledge. Actual knowledge of a defect gives rise only to the duty to warn; the duty to repair must be assumed by agreement. *Zimmerman, supra.*

Assuming Hargitt and Moody did reach an agreement concerning repairs, their underlying intent in doing so remains a factual matter for the jury to divine, not us. Dickison is entitled to let the jury perform its function.

Finally, we observe that merely establishing the existence of an agreement does not end the matter. In *Childress, supra,* our supreme court adopted section 357 of the Restatement (Second) of Torts, which requires that Dickison also demonstrate the disrepair created an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented, and that the lessor failed to exercise reasonable care to perform his contract.

## III

### *Did Dickison's Own Conduct Bar Recovery?*

■ Characterizing Dickison's injuries as "self-inflicted," *record* at 501, the trial court held Dickison's conduct precluded his recovery as a matter of law.

Our General Assembly's enactment of a Comparative Fault Act, IND.CODE 34–4–33–1 *et seq.,* "reflects a legislative determination that 'fairness' is best achieved by a

relative assessment of the parties' respective conduct." *Robbins v. McCarthy* (1991), Ind.App., 581 N.E.2d 929, 932, *trans. denied.*[4] The statute's definition of "fault" includes any act that is negligent, willful, wanton, or reckless, but excludes intentional acts, for which no recovery is allowed. IND.CODE 34–4–33–2. "Intentional acts not covered by the Act involve consequences desired or consequences which the actor believes are certain or substantially certain to follow." *Robbins, supra*, at 933 (citing *Foster v. Purdue University* (1991), Ind.App., 567 N.E.2d 865, 869, *trans. denied*).

The evidence presented at trial unequivocally demonstrated both that Dickison intentionally drank beer and smoked marijuana and that he did not intentionally fall through the defective railing and crack his head open. By all accounts, the fall was accidental. Although at some point the apportionment of fault may become a question of law for the court, that point is reached only when there is no dispute in the evidence and the factfinder is able to come to only one logical conclusion. *Id.* at 934. We feel that point has not been reached in this case. Although Dickison's alleged intoxication should not and does not relieve him of his responsibilities, we cannot say that Dickison's conduct compels the conclusion that, as a matter of law, his fault was greater than everyone else's, even though a jury may very reasonably find he was, in fact, more to blame than not. Instead, this is precisely the kind of apportionment that should be left for the jury. The trial court's conclusion that Dickison's conduct barred his recovery as a matter of law was erroneous.

### Conclusion

To resolve the issues of Hargitt's duties, then, the jury must first determine whether Hargitt actually knew the railing's defect existed. If Hargitt did not know the railing was defective, he had no duty to warn. *Zimmerman, supra.* And although Hargitt could have assumed a duty to repair the railing even in the absence of

actual knowledge, there is no claim that he did so. Thus, if Hargitt had no knowledge of the railing's defect, he had neither a duty to warn of it nor a duty to repair it.

If, however, Hargitt did actually know the railing was defective, he may have had a further duty to repair the railing, depending on whether he agreed to accept that obligation. If he had no further duty to repair, he would still be liable for breaching the duty to warn, since the warning he gave was inadequate to fulfill that duty. And if he did assume the duty to repair, he would be liable for breaching it, as well, because he did not repair the railing. Of course, this analysis assumes both that the railing was defective and that the defect was hidden, two more matters for the jury to resolve.

We reverse the trial court's entry of judgment on the evidence and remand with instructions to proceed in a manner consistent with this opinion.

Reversed and remanded.

NAJAM and RUCKER, JJ., concur.

---

**4.** It is still the case, however, that a plaintiff whose fault is greater than the fault of all persons whose fault proximately caused the plaintiff's damages recovers nothing. IND.CODE 34–4–33–4.