HOOKS SUPERX, INC., Kathy O'Dell and Craig Merrick, Defendants–Appellants,

v.

Patrick   D.   McLAUGHLIN,   Michelle McLaughlin, for themselves and as parents, guardians and next friends of Patrick Michael McLaughlin, and Alicia Rose McLaughlin, Minors, Plaintiffs–Appellees.

No. 50S03–9411–CV–1067.

Supreme Court of Indiana.

Nov. 9, 1994.

Anthony DeBonis, Jr., Smith & DeBonis, East Chicago, for appellee.

John C. Hamilton, Doran, Blackmond, Ready, Hamilton & Williams, Robert J. Konopa, Konopa & Murphy, South Bend, for appellant.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

Where a pharmacy customer is having a prescription for a dangerous drug refilled at an unreasonably faster rate than the rate prescribed, the pharmacist has a duty to cease refilling the prescription pending direct and explicit directions from the prescribing physician.

Pharmacy customers, Patrick and Michelle McLaughlin (plaintiffs-appellees below), seek transfer after the Court of Appeals reversed

the trial court, which had recognized such a duty, and ordered the entry of summary judgment in favor of Hooks–SuperX, Inc., Kathy O'Dell and Craig Merrick (defendants-appellants below) (collectively "Hooks"). *Hook's–SuperX, Inc. v. McLaughlin* (1994), Ind.App., 632 N.E.2d 365.

### Facts

The following facts are uncontested for purposes of summary judgment. Patrick McLaughlin injured his back while working as a lumberjack in the state of Washington. In the course of treatment for that injury, he became addicted to propoxyphene, the active chemical in the drugs Darvocet and Darvon. He was treated for the addiction in 1982, 1983, and 1987, but he did not stop using the drug. In 1988, because he was still experiencing pain from the injury, he began treatment with Dr. Bernard Edwards in South Bend, Indiana. Over a period of months in 1988, McLaughlin obtained prescriptions for drugs containing propoxyphene from Dr. Edwards. Most of these prescriptions were filled at a Hooks drugstore in South Bend by pharmacists Kathy O'Dell and Craig Merrick. The prescriptions were dispensed either on the basis of written prescriptions from Dr. Edwards brought to Hooks by McLaughlin, telephone calls to the store from the doctor's office, or as refills.

McLaughlin consumed these drugs at a rate much faster than prescribed. Hooks' records show that dozens of prescriptions for Darvocet or Darvon were filled for McLaughlin between May 1987 and December 1988. For example, during one sixty-day period in 1988, McLaughlin received twenty-four separate refills of propoxyphene compounds, totalling 1,072 tablets. If consumed according to the prescription, the number of tablets would have lasted a period of 138 days; McLaughlin consumed the tablets in 62 days, almost two and one half times faster than the prescription ordered. In one month alone, propoxyphene prescriptions were filled twelve times, which means that McLaughlin or his wife appeared in the Hooks store once every two or three days.

In late 1988, after Dr. Edwards apparently became aware that McLaughlin was consuming propoxyphene drugs at a rate much faster than prescribed, he refused to furnish any more prescriptions. Shortly thereafter, McLaughlin's wife found her husband holding a shotgun to his head at a time of depression. He did not pull the trigger. Following treatment for drug addiction in early 1989, McLaughlin stopped taking all prescription pain medication.

The McLaughlins sought recovery against Hooks on the theory that it breached its duty of care by failing to stop filling the prescriptions because the pharmacists knew or should have known that McLaughlin was consuming the drugs so frequently that it posed a threat to his health. Hooks moved for summary judgment on the grounds that it owed no such duty or, alternatively, McLaughlin's consumption of the drugs and his suicide attempt constituted an intervening cause of his injuries. The trial court denied the motion, and at Hooks' request, certified an interlocutory order for appeal of both issues. Ind.Appellate Rule 4(B)(6). A majority of the Court of Appeals concluded that no duty existed and that imposition of a duty would be contrary to public policy because it would undermine the physician-patient relationship. *Hook's*, 632 N.E.2d at 368. Because of that holding, the Court of Appeals did not reach the issue of causation. The Court of Appeals remanded the case with instructions for the trial court to enter summary judgment in favor of Hooks.

The McLaughlins seek transfer. We address the following issues:

1. Whether pharmacists may be legally obligated to refuse to fill validly-issued prescriptions; and

2. Whether, as a matter of law, McLaughlin's suicide attempt and his over-consumption of prescription drugs was an intervening cause of the alleged injuries.

### Standard of Review

This case was resolved by summary judgment for which our standard of review is well-established. The reviewing court faces the same issues that were before the court below and follows the same process. *Great-*

*house v. Armstrong* (1993), Ind., 616 N.E.2d 364, 366. Although the party appealing from the grant of summary judgment has the burden of persuading the reviewing court that the entry of summary judgment was erroneous, the reviewing court carefully scrutinizes the decision to assure that the party against whom summary judgment was entered was not improperly prevented from having his day in court. *Id.* Summary judgment is appropriate only if the pleadings and evidence sanctioned by Indiana Trial Rule 56(C) show "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." T.R. 56(C).

### Duty

■ It is axiomatic that without a duty, there can be no recovery in negligence. *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992, 995; *Miller v. Griesel* (1974), 261 Ind. 604, 611, 308 N.E.2d 701, 706. Whether the law recognizes any obligation on the part of a particular defendant to conform his conduct to a certain standard for the benefit of the plaintiff is a question of law exclusively for the court. *Gariup Constr. Co. v. Foster* (1988), Ind., 519 N.E.2d 1224, 1227. In *Webb v. Jarvis*, this Court utilized a three-part analysis to be applied when deciding whether a duty exists. Likewise, we will consider (1) the relationship between the parties; (2) the foreseeability of the harm; and (3) public policy issues. 575 N.E.2d at 995.

**1. Relationship.** It has long been established that the existence of a duty upon one to act with respect to another arises out of the relation between them. *Gariup*, 519 N.E.2d at 1227–28. That the law recognizes a relationship between pharmacist and customer as one that gives rise to a duty in other circumstances is well-established. *See, e.g., Forbes v. Walgreen Co.* (1991), Ind.App., 566 N.E.2d 90, 91 (pharmacist liable for dispensing wrong medicine); *Ingram v. Hook's Drugs, Inc.* (1985), Ind.App., 476 N.E.2d 881, 883 (pharmacist required to inform patient of warnings included in the prescription). *Ingram* and *Forbes* recognize a duty on the part of the pharmacist to follow the physi-

cian's instructions contained in the prescription. Here, we must determine whether the pharmacist has a duty under certain circumstances to refrain from dispensing the prescription as written.

■ The relationship between pharmacist and customer is a direct one based upon contract and is independent of the relationship between physician and patient. Our law is replete with instances where privity of contract is a relationship sufficient to form the basis for tort liability. *E.g., Erie Ins. Co. v. Hickman* (1993), Ind., 622 N.E.2d 515 (insurer/insured); *Webb v. Jarvis*, 575 N.E.2d 992 (physician/patient); *Citizens Gas & Coke Util. v. American Economy Ins.* (1985), Ind., 486 N.E.2d 998 (contractor/customer); *Dickison v. Hargitt* (1993), Ind.App., 611 N.E.2d 691 (landlord/tenant); *Reasor v. Putnam County* (1994), Ind. 635 N.E.2d 153, *reh'g pending* (surveyor/customer). It is a matter of common expectation as well as statute[1] that pharmacists possess expertise regarding the dispensing of prescription drugs. It is a matter of common understanding that customers rely upon pharmacists for that expertise. Upon this basis, we conclude that the relationship between pharmacist and customer is sufficiently close to justify imposing a duty.

■ **2. Foreseeability.** Turning to the next factor to be considered, we note that it is well-established that a duty is imposed only where a reasonably foreseeable victim is injured by reasonably foreseeable harm. *Webb*, 575 N.E.2d at 997. This inquiry into foreseeability involves the same considerations as in the context of proximate cause, except that it is determined by the court as a matter of law, and not, as is usually case with proximate cause, by the trier of fact. *Id.* It is not disputed here that one who consumes sufficient quantities of addictive substances may become addicted to them, and that such an addiction carries with it certain reasonably foreseeable consequences. *But cf. Webb*, 575 N.E.2d at 997 (causal connection between the use of steroids and violent behavior not well-established; not reasonably foreseeable that physician's prescribing med-

---

**1.** *See* Ind.Code §§ 25–26–13–1 through 25–26– 13–29 (1993).

ication would put patient in such a state that patient would use a weapon to cause harm to another). Thus, we are satisfied that, for purposes of determining whether a duty exists, the risk of McLaughlin's addiction was foreseeable from the series of events that took place.

**3. Public Policy.** The third factor to be considered is that of public policy. "What the public policy of a state is must be determined from a consideration of its Constitution, its statutes, the practice of its officers in the course of administration, and the decisions of its court of last resort." *Hogston v. Bell* (1916), 185 Ind. 536, 545, 112 N.E. 883, 886. We perceive three policy considerations at stake here: preventing intentional and unintentional drug abuse, not jeopardizing the physician/patient relationship, and avoiding unnecessary health care costs.

There are several explanations for why a pharmacy customer might have a prescription for a dangerous drug refilled at a rate unreasonably faster than that prescribed. Among them are that the customer may have developed an addiction to the drug or that the customer is improperly disposing of the drug. Both of these explanations give rise to the strong public policy interest in preventing intentional and unintentional drug abuse.

■ Our legislature has expressed this policy interest in many enactments. For example, the Pharmacy Act[2] reflects important public policy concerns about addiction and the health and safety of the customer. In particular, Indiana Code § 25–26–13–16 (1993) provides:

(a) A pharmacist shall exercise his professional judgment in the best interest of the patient's health when engaging in the practice of pharmacy.

(b) A pharmacist has a duty to honor all prescriptions from a practitioner or from a physician.... Before honoring a prescription, the pharmacist shall take reasonable steps to determine whether the prescription has been issued in compliance with the laws of the state where it originated. *The pharmacist is immune from criminal prosecution or civil lia-*

*bility if he, in good faith, refuses to honor a prescription because, in his professional judgment, the honoring of the prescription would:*

(1) *Be contrary to law;*

(2) *Be against the best interest of the patient;*

(3) *Aid or abet an addiction or habit; or*

(4) *Be contrary to the health and safety of the patient.*

(Emphasis added). We reject McLaughlin's argument that the pharmacist's duty arises by virtue of this statute alone because the statute merely permits, but does not require, a pharmacist to decline to fill a valid prescription. Nonetheless, by empowering pharmacists to exercise their professional judgment, the statute does demonstrate that public policy concerns about proper dispensing of prescription drugs and preventing drug addiction might be paramount to policy concerns about interfering with the physician-patient relationship.

Hooks relies on *Ingram v. Hook's Drugs, Inc.* (1985), Ind.App., 476 N.E.2d 881, for the proposition that pharmacists are not responsible for exercising independent judgment about whether to fill a particular prescription because such interference might occur. In *Ingram*, the plaintiff experienced an adverse reaction to Valium and fell from a ladder. He sued the pharmacy alleging that the pharmacist should have warned him about this and other possible side effects associated with the drug. The Court of Appeals concluded that physicians, not pharmacists, were in the better position to weigh the potential risks and rewards of particular medications for specific patients, and declined to impose a duty upon pharmacists to warn customers about the potential side effects of medication unless such warnings were included in the prescription received from the physician. *Id.* at 886–87. Although we agree that the responsibility of warning patients about drug side effects lies with physicians, we do not find *Ingram* controlling because it did not involve the rate at which the customer was consuming drugs. *Ingram* does not address instances where a pharmacist has personal

**2.** Ind.Code §§ 25–26–13–1 through 25–26–13–29    (1993).

knowledge that a customer is taking medication more quickly than prescribed.

Despite Hooks' lamentations to the contrary, we do not perceive that physicians and pharmacists will become adversaries if pharmacists are expected to cease refilling prescriptions where the customers are using the drugs much more rapidly than prescribed. First, as has been discussed, pharmacists currently possess that authority by statute. Second, physicians remain ultimately responsible for properly prescribing medication, and recognition of a duty on the part of pharmacists will not replace the physician's obligation to evaluate a patient's needs. We believe recognition of a legal duty will encourage pharmacists and physicians to work together in considering the best interests of their customers and patients.

Concern over increased health care costs which might result from imposition of new duties on pharmacists is also a valid public policy consideration here, so we consider whether recognition of a duty will increase the operational costs to Hooks and the cost of prescription drugs in general. Here, a Hooks district manager testified in deposition that Hooks used a computerized information system that permitted pharmacists to review the prior history of a patient's prescriptions from a particular store. Thus, every time McLaughlin filled a prescription at this store, the pharmacist had easy access to his entire prescription history. The existence of such a system leads us to conclude that the capital investment necessary to comply with the duty we recognize today has already been made, at least by Hooks. In fact, the logic of imposing this duty can hardly be denied when the rate at which any prescription is being refilled is before the pharmacist on the computer screen at the time each prescription is filled.

Consideration of the three pertinent factors—the relationship between the parties, foreseeability of the harm, and public policy concerns—convince us that a duty should be recognized here. Clearly, society has an interest in preventing the overuse and misuse of prescription drugs. Recognizing that pharmacists have a duty in this regard helps further that goal. The duty imposed is simply a practical recognition of the relationship between pharmacist and customer.

■ Having recognized a duty, we must decide what standard of care will be imposed. *Miller v. Griesel,* 261 Ind. at 611, 308 N.E.2d at 706. We perceive no reason why the traditional negligence standard should not apply. *See id.* Accordingly, we hold that pharmacists must exercise that degree of care that an ordinarily prudent pharmacist would under the same or similar circumstances. What constitutes due care in a particular case will depend upon the circumstances of that case, and will usually be a question of fact. *Miller,* 261 Ind. at 613, 308 N.E.2d at 707. The determination of whether due care was exercised in a particular case may involve such issues as the frequency with which the pharmacist filled prescriptions for the customer, any representations made by the customer, the pharmacist's access to historical data about the customer, the manner in which the prescription was tendered to the pharmacists, and the like.

■ In imposing this standard of care, we emphasize that filling prescriptions faster than prescribed is not necessarily a breach of the duty owed. For example, it may be prudent for a pharmacist to refill a prescription at a rate faster than prescribed in the first few days following surgery or in anticipation of travel. Given that cases are usually factually unique, any complete listing here is impossible. We are confident that the skilled pharmacists of our state, particularly when aided with computerized customer information records, will be readily able to determine when a prescription is being refilled at an unreasonably faster rate than the rate prescribed.

■ Lastly, we emphasize that pharmacists are not insurers against a customer becoming addicted to medication legally prescribed by physicians. Customers are not relieved of responsibility for their own safety. *See Stephenson v. Ledbetter* (1992), Ind., 596 N.E.2d 1369, 1372–73 (same responsibility placed on intoxicated passenger as on sober passenger). Also relevant may be the customer's own knowledge, *see Douglass v. Irvin* (1990), Ind., 549 N.E.2d 368, 369–70 (invi-

tee's knowledge of dangerous condition), and whether the customer acted intentionally, or merely negligently. *Compare Dickison v. Hargitt* (1993), Ind.App., 611 N.E.2d 691, 698 (although plaintiff's intoxication may have been intentional, his falling off balcony was not) *with Foster v. Purdue Univ.* (1991), Ind.App., 567 N.E.2d 865, 870, *trans. denied* (plaintiff's intentional conduct of diving onto waterslide barred recovery under Comparative Fault Act).

### Causation

█ Hooks argues that even if it was negligent in filling the prescriptions, McLaughlin is barred from any recovery because, as a matter of law, he caused whatever injuries he sustained. The Court of Appeals did not reach this issue because it concluded that no duty existed. In view of our recognition of a duty, we now address Hook's argument on causation.

First, Hooks urges us to find it not liable as a matter of law because McLaughlin's suicide attempt and his own wrongful conduct in consuming substances he knew were addictive constituted an independent intervening cause sufficient to cut off any liability of Hooks. McLaughlin responds that the doctrine of intervening cause does not apply because McLaughlin's actions were foreseeable or, alternatively, that the Comparative Fault Act eliminates the use of the common law doctrine.

█ Indiana has long recognized the doctrine of intervening cause. *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154, 158. As then-Chief Justice Givan wrote in *Havert:*

[T]he authorities are clear that where the negligent actor's act or omission has the effect of setting in motion the chain of events leading to the injury, the key to holding that act or omission to be the proximate cause of the injury is that the ultimate injury be one that was foreseen or reasonably should have been foreseen, as the natural and probable consequence of the act or omission. Our case law recognizes this important limitation in determining whether the actor's act or omission is the proximate cause of the injury complained of.

452 N.E.2d at 158. An intervening negligent act breaks the chain of causation only if the harm resulting from the intervening act could not have been reasonably foreseen by the original negligent actor. *Walker v. Rinck* (1992), Ind., 604 N.E.2d 591, 596. An intervening cause is not a concurrent and contributing cause like the acts of joint tortfeasors, but instead is treated as a superseding cause that results in the original negligence being considered a remote cause and not a proximate cause. *Havert,* 452 N.E.2d at 158 (citing 21 I.L.E. *Negligence* § 67 (1959)). We repeat the explanation of the doctrine from 21 I.L.E. *Negligence* § 67, at 330–333:

Accordingly, if harm is a natural, probable, and foreseeable consequence of the first negligent act or omission, the original wrongdoer may be held liable even though other independent agencies intervene between his negligence and the ultimate result. Generally, where harmful consequences are brought about by intervening and independent forces, the operation of which might have been reasonably foreseen, then the chain of causation extending from the original wrongful act to the injury is not broken by the intervening and independent forces, and the original wrongful act will be treated as a proximate cause; but, if the new independent intervening force was not reasonably foreseeable at the time of the actor's wrongful conduct, the consequences ordinarily, are not caused by the original wrongful act.

██ As was recently acknowledged by this court, Indiana decisions hold that suicide constitutes an intervening cause, as a matter of law, if committed by one who is sane enough to realize the effect of his actions. *Kimberlin v. DeLong* (1994), Ind., 637 N.E.2d 121 (rule applies only where the original tortfeasor was negligent; rule does not apply where the original tortfeasor acted intentionally). Suicide by a sane person is sufficient to break the causal connection between the original negligence and the suicide. *Riesbeck Drug Co. v. Wray* (1942), 111 Ind. App. 467, 39 N.E.2d 776. In *Riesbeck,* a druggist negligently sold poison to the un-

derage son of the decedent, who used the poison to kill himself. The Court held that the pharmacist could not be held liable for that negligence because the decedent's suicide constituted an intervening cause:

A voluntary, willful act of suicide of an injured person, who knows the purpose and physical effect of his act, is generally held to be such a new and independent agency as does not come within and complete a line of causation from the injury to the death so as to render the one responsible for the injury civilly liable for the death.

111 Ind.App. at 476, 39 N.E.2d at 780. That is, suicide constitutes an intervening cause only if it is the "voluntary" and "willful" act of the victim. Suicide induced by mental illness so severe that one cannot direct one's conduct does not constitute an intervening cause. We cannot say as a matter of law that the trial court erred in refusing to grant summary judgment for Hooks on this issue because the trial court may well have concluded that a genuine issue of material fact remained as to whether McLaughlin's suicide attempt was voluntary or whether it was involuntarily induced by a reaction to his drug addiction.

### Conclusion

Accordingly, we now grant transfer, vacate the opinion of the Court of Appeals, and affirm the trial court in its denial of Hooks' motion for summary judgment. Ind.Appellate Rule 11(B)(3).

SHEPARD, C.J., and DeBRULER and DICKSON, JJ. concur.

GIVAN, J., dissents without separate opinion.