Christine MASICK and Jonathon Masick, Appellants–Plaintiffs,

v.

McCOLLY REALTORS, INC. and Saxon Drywall, Inc., Appellees–Defendants.

No. 37A03–0601–CV–38.

Court of Appeals of Indiana.

Dec. 22, 2006.

Robert J. Boughter, Stiles Boughter, LLP, Fort Wayne, IN, Charles P. Dargo, Law Offices of Charles P. Dargo, P.C., Demotte, IN, Attorneys for Appellants.

Daniel G. Suber, Lizabeth R. Hopkins, Suber & Davis, Valparaiso, IN, Attorneys for McColly Realtors, Inc.

James H. Austen, Matthew D. Barrett, Starr Austen Tribbett Myers & Miller, Logansport, IN, Attorneys for Saxon Drywall, Inc.

## OPINION

MAY, Judge.

Christine Masick fell on a temporary step and hit her head while looking at a house that was under construction and listed for sale with McColly Realtors. She sued McColly and Saxon Drywall, a subcontractor whose employees were working on the house, alleging McColly and Saxon had a duty to warn her of the defective step but failed to do so. The trial court granted summary judgment for McColly and Saxon; we affirm in part, reverse in part, and remand.[1]

## FACTS AND PROCEDURAL HISTORY

On October 2, 2003, Masick and real estate agent Melissa Capellari were looking at a house that was under construction. Capellari worked for McColly Realtors, who had been retained by Hollandale Builders, the builder and property owner, to sell the house.

In the garage, Hollandale had placed a temporary wooden step at a doorway to the house. Hollandale built the step and took it from house to house during construction projects. The step was not attached to the wall.

On that day, employees of Saxon Drywall were working in the house and garage. One Saxon worker noted the step was not attached to anything and wobbled when he stepped on it. Because the step moved when he stepped on it, he decided not to use it. The drywall worker advised Capellari the step was not sturdy and she should be careful.[2] Masick was in the room with the drywall worker and the McColly agent at that time. Later, after looking at the inside of the house, Masick

1. We heard oral argument on October 31, 2006, at Elkhart Central High School. We thank the school for its hospitality and commend counsel for the quality of their advocacy.

2. Masick claims the drywall worker told Capellari "he himself almost fell on the step." (Appellants' Br. at 5.) There is no such statement on the page of the appendix to which Masick directs us. Masick stated the Saxon employees never warned her about the step; a Saxon worker testified he told Capellari, while Masick was in the same room, to be careful because the step was not sturdy. (App. at 27.)

entered the garage. The step gave way and she fell. In March of 2005, Masick sued McColly and Saxon, claiming both were negligent because they did not warn her the step was dangerous.

## DISCUSSION AND DECISION

In reviewing a summary judgment we apply the standard applicable in the trial court. Summary judgment is appropriate when the designated evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Elliott v. Sterling Mgmt. Ltd., Inc.*, 744 N.E.2d 560, 563 (Ind.Ct.App.2001). The party who has not prevailed below has the burden of persuading us the grant of summary judgment was erroneous, but we will carefully assess the trial court's decision to ensure that party was not improperly denied its day in court. *Id.* All facts and reasonable inferences drawn from those facts are construed in favor of the party that lost below. *Id.*

### 1. The Judgment for Saxon

Saxon did not have sufficient control over the step to subject it to liability for failure to warn Masick about it; summary judgment for Saxon was therefore appropriate.

■■■ Contractors may be liable for negligence while their work is in progress because they are presumably in a better position than the landowner to prevent injuries to third parties. *Blake v. Calumet Constr. Corp.*, 674 N.E.2d 167, 170 (Ind. 1996), *abrogated on other grounds by Peters v. Forster*, 804 N.E.2d 736 (Ind.2004). Thus, an independent contractor may be held liable when the contractor is in con-

trol of the construction or premises and the contractor's negligence results in injury to another person on the premises. *Guy's Concrete, Inc. v. Crawford*, 793 N.E.2d 288, 295 (Ind.Ct.App.2003), *trans. denied* 804 N.E.2d 760 (Ind.2003). In determining whether Saxon had a duty to warn Masick, we accordingly examine whether (1) Saxon was performing work and was in control of the construction or the premises; and (2) Masick was rightfully on the premises.[3] *See Id.*

We have held:

> The thread through the law imposing liability upon occupancy of premises is control. [O]nly the party who controls the land can remedy the hazardous conditions which exist upon it and only the party who controls the land has the right to prevent others from coming onto it. Thus, the party in control of the land has the exclusive ability to prevent injury from occurring.

*Harris v. Traini*, 759 N.E.2d 215, 225 (Ind.Ct.App.2001) (citations omitted), *trans. denied* 774 N.E.2d 516 (Ind.2002). The rationale is to subject to liability the person who could have known of any dangers on the land and therefore could have acted to prevent any foreseeable harm. *Pelak v. Ind. Indus. Servs. Inc.*, 831 N.E.2d 765, 769–70 (Ind.Ct.App.2005), *reh'g denied, trans. denied.*

The Restatement (Second) of Torts § 328E provides:

> A possessor of land is:
>   (a) a person who is in occupation of the land with intent to control it, or
>   (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or

---

3. The parties do not dispute Saxon was performing work and Masick was rightfully on the premises.

(c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b).

*Reed v. Beachy Const. Corp.*, 781 N.E.2d 1145, 1150 (Ind.Ct.App.2002), *trans. denied* 792 N.E.2d 42 (Ind.2003).

In *Guy's Concrete*, a builder subcontracted with Guy's to perform concrete work and with Modern Heating to perform heating and cooling work. The builder indicated each subcontractor was responsible for safety in its particular area. A framing subcontractor created an opening in the floor for a stairwell to the basement. Guy's placed a heater in the basement to thaw the basement floor. It lowered the heater into the basement then placed Celotex, an insulating material that was approximately one inch thick, over the stairwell hole to retain the heat in the basement. The material was not strong enough to support the weight of a person walking on it. Guy's took no precautions to prevent anyone from walking on the Celotex after covering the hole to the basement because use of the Celotex was "an industry practice" and other contractors "would know what it was for." 793 N.E.2d at 291.

While the house was under construction, the builders met Crawford and encouraged her to look at the house they were building. When Crawford arrived Modern's employee was at the house to turn on the furnace in the basement. He removed the Celotex from the opening to the basement, performed his work in the basement, then replaced the Celotex over the opening. He was leaving as Crawford arrived and he did not tell Crawford about the Celotex over the basement opening. Crawford stepped onto the Celotex and fell into the basement. She sued Guy's and Modern, alleging they owed her a duty of care, they

were negligent, and she was injured as a proximate cause of the negligence.

Guy's and Modern moved for summary judgment, alleging among other things they owed Crawford no duty. The trial court denied both motions and we affirmed. The trial court found Guy's and Modern both had some control over the area where Crawford fell, Modern's employee removed and replaced the Celotex, in effect recreating the hazardous condition, and Crawford had no warning about the condition. *Id.* at 292.

Masick asserts, without citation to authority, Saxon had control over the step because its employees "utilized the step to get to and from its work area giving them control over the step." (Appellants' Br. at 15.) Only Saxon, she says, had knowledge of the defective condition; Saxon therefore was obliged to protect against foreseeable injury to prospective homebuyers who "could not appreciate the lurking danger." *Id.* The Saxon employees were the only others present when Masick, her family, and the McColly agent came to look at the house. And, she asserts, "Saxon was in the best position to know of any defects in or about the property and should have warned her about any such known defects." *Id.*

We decline to hold Saxon's use of the step or the mere presence of its employees at the house when Masick fell demonstrates sufficient control over the step to impose on Saxon a duty to warn Masick. Evidence was designated that Saxon did not construct, design, own, or maintain the step. The step was owned by Hollandale, the general contractor and owner of the land and building, and it was built by a Hollandale employee. Hollandale took it from house to house during construction projects.

By contrast, the subcontractors found to have control in *Guy's Concrete* "exercised

control by covering and uncovering the basement stairwell with the Celotex." (Br. of Appellee, Saxon Drywall, Inc. (hereinafter "Saxon Br.") at 10.) Because Saxon did not control the step, it had no duty to warn Masick about it. Summary judgment for Saxon was not error.

### 2. *The Judgment for McColly*

Masick and McColly both acknowledge the nature and scope of a real estate broker's duty toward a prospective homebuyer in a situation such as this is one of first impression in Indiana. Neither party directs us to authority from elsewhere that addresses the question. In light of the rationale of decisions from other courts that have addressed this question, we decline to impose, on real estate agents who do not control a premises, a duty to inspect properties for sale and to warn prospective buyers of dangerous conditions they discover. However, we hold a broker does have a duty to warn a prospective buyer of a latent defect of which the broker is aware.

The trial court did not articulate the basis for its summary judgment. McColly asserts the summary judgment in its favor was based on a premises liability theory, as Masick's complaint alleged McColly "owned, maintained, occupied, controlled, and/or otherwise made available" the premises where Masick fell. McColly argues only a landowner or person who occupies or controls property owes a duty to someone injured by a condition on the property, citing *Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind.2004):

> In premises liability cases, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred. The rationale is to subject to liability the person who could have known of any dangers on the land and

therefore could have acted to prevent any foreseeable harm.

Masick urges us to apply a more general negligence theory of liability, balancing three factors to determine whether there is a duty: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns. *Williams v. Cingular Wireless*, 809 N.E.2d 473, 476 (Ind.Ct.App. 2004), *trans. denied* 822 N.E.2d 976 (Ind. 2004). Some courts have taken this approach:

> Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.

*Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 625 A.2d 1110, 1116 (1993) (citations omitted).

There, the court determined a real estate broker who holds an "open house" has a duty to warn prospective buyers of dangerous conditions in the home. A relative of a prospective buyer fell where steps between floors were covered with the same pattern vinyl. This, Hopkins alleged, camouflaged the presence of a step. Not anticipating the step, she lost her footing and fell. The realtor was granted summary judgment but the *Hopkins* court reversed, noting:

The basic question to be answered by this appeal implicates a broader issue: whether a broker's duty of care in these circumstances is to be determined by the traditional common-law doctrine that defines the duty of care imposed on owners and possessors of land or, instead, by more general principles that govern tort liability.

*Id.* at 1112. The court took the latter approach, following those jurisdictions that have eliminated the common-law boundaries between premises-liability classifications (trespasser, licensee or invitee) because to so focus on the status of an injured party to determine the question of whether a landowner had a duty of care is contrary to modern social mores and humanitarian values. *Id.* at 1115.

■■■ Our courts have not yet "eliminated the common-law boundaries between premises-liability classifications" of trespasser, licensee or invitee: "[T]he first step in resolving a premises liability case is to determine the plaintiff's visitor status.

The visitor status then defines the duty owed from the landowner to the visitor." *Rhoades v. Heritage Invs., LLC,* 839 N.E.2d 788, 791 (Ind.Ct.App.2005) (citation omitted), *reh'g denied, trans. denied.* We accordingly decline to impose a duty on real estate brokers unless they have control over the premises sufficient to independently give rise to a duty to warn under recognized premises liability principles.[4]

While our decisions have not addressed this specific question, courts elsewhere have found a real estate broker employed to sell property is not in "possession and control" of property unless the broker had a contractual duty to the owner to keep the premises in repair. *See, e.g., Christopher v. McGuire,* 179 Or. 116, 169 P.2d 879, 881 (1946). That court said "A real estate broker employed to sell property has the right of entry for such purpose, but can it be said that by so doing he is in 'possession and control' of the property? We think not." *Id.*[5]

4. Masick does not argue McColly had control over the premises, though she does argue a broker is "in a far better position than prospective homebuyers to know of any dangers on the property given their relationship with the property owner. Typically, realtors are provided information about properties they are going to sell and have visited the properties prior to selling them." (Appellants' Br. at 20.)

5. Other courts have determined, applying a variety of legal standards, realtors showing a house under a listing agreement with the owner are either possessors of the property or are acting on behalf of the possessors of the property and they may accordingly be held liable for injuries sustained by customers inspecting the property. *E.g., Coughlin v. Harland L. Weaver, Inc.,* 103 Cal.App.2d 602, 230 P.2d 141, 144 (1951); *Jarr v. Seeco Constr. Co.,* 35 Wash.App. 324, 666 P.2d 392, 395 (1983) (finding a realtor showing property may be held liable for harm caused thereby under a theory of premises liability based on the contractual relationship with the owner).

In *Smith v. Inman Realty Co.,* 846 S.W.2d 819 (Tenn.Ct.App.1992), the court found, in the context of an appeal of the involuntary dismissal of the real estate agent, that the trial court erred when it determined Inman was not in sufficient possession or control of the property to be held liable for Smith's injuries. Its holding appears based on agency principles, which neither party addresses in the case before us:

Inman had entered into a contract with the property owner giving it the exclusive right to sell the property. Of necessity, this contract gave Inman the authority to take whatever possession and control of the property that would be reasonably required to effect a sale, including the power to invite prospective buyers onto the property and to conduct tours of the house. Thus, Inman was in possession of the property for the purposes of Restatement (Second) of Torts § 343 (1965) or was at least acting on behalf of the possessor for the purpose of Restatement (Second) of Torts § 383 (1965).

The *Hopkins* court addressed the burden that would be placed on a real estate broker in preventing such a risk to a client. It noted in many cases, the customer may reasonably expect the broker will be familiar with the premises and would rely on the broker's presumed familiarity with the house, including knowledge of all its important features and physical characteristics. Such factors would ordinarily include defects such as broken steps, exposed electrical wiring, and missing or weak railings. 625 A.2d at 1118.

But the court noted not all brokers are familiar with all the houses they may show to potential buyers; some will not have had the opportunity to inspect the house before an open house commences:

> [U]nanswered by this record is whether a reasonable broker should inspect the house in order to conduct the open-house tour. Thus, a broker's knowledge of dangerous conditions in a given residence and the broker's ability to warn visitors of such defects is heavily contingent on whether it is reasonable under the circumstances for the broker to have inspected the premises or otherwise become familiar with the property in preparation for an open-house inspection and whether the broker had an adequate opportunity to do so.
>
> We thus determine that a broker is under a duty to conduct a reasonable broker's inspection when such an inspection would comport with the customary standards governing the responsibilities and functions of real-estate brokers with respect to open-house tours. Those standards should ordinarily be elucidated by witnesses who are expert in the real-estate brokers' field. Such inspection should consist of an examination of the premises to ascertain the obvious

physical characteristics that are material to its saleability, as well as those features that a prospective purchaser would routinely examine during a "walk through" of the premises. Included are such features relating to the safety, not only of the customer as a potential buyer and ultimate owner or occupier of the home, but also of visitors who are present on the property on the invitation of the broker. That inspection would impose on the broker the duty to warn of any such discoverable physical features or conditions of the property that pose a hazard or danger to such visitors.

*Id.* at 1118–19.

But that duty would not require the broker to warn against dangers not otherwise known to the broker or that would not be revealed during the course of a reasonable broker's inspection. *Id.* at 1119. A broker is not a guarantor of the safe condition of the premises. *Id.* The court acknowledged:

> The situation in which a broker has no discernable or tangible duty arising from its presence on the property because the broker would not reasonably be required to inspect the property or have an opportunity to do so. ·See, e.g., *Christopher v. McGuire,* 179 Or. 116, 169 P.2d 879 (1946) (refusing to attribute duty to broker showing sole customer residence in which neither party had ever been previously present); *Turner v. Carneal,* 156 Va. 889, 159 S.E. 72 (1931) (same).

*Id.*

Masick asserts, with no citation to legal authority, "several reasons why public policy commands that a duty be imposed on realtors to warn of known defective conditions on property that they are selling to

---

Smith therefore made out a *prima facie* case for Inman's liability and her case should have

survived Inman's motion for involuntary dismissal. 846 S.W.2d at 823.

prospective homebuyers." (Appellants' Br. at 20.) Those reasons include 1) real estate agents benefit financially from selling real estate to prospective buyers such as Masick; and 2) real estate agents are in a better position than are the prospective buyers to know of dangers on the property. Failing to impose a duty on real estate agents "places prospective homebuyers at risk for their personal safety out of zeal for the sell [sic] of the property." (Id. at 21.)

McColly argues, also without citation to authority, it is not sound public policy to impose such a duty. It notes a real estate agent sometimes sees a house for the first time when showing it to a prospective buyer and has no better knowledge of its defects than does the client. It would be "unduly burdensome," (McColly Br. at 8), to require a real estate agent to inspect each property before showing it. Finally, McColly asserts the client is not without a remedy because she can sue the owner.

While neither Masick nor McColly offers legal authority to support these characterizations of public policy, all those policy concerns have been recognized. In Hopkins, the realtor contended the risk attendant in holding an open house is rationally allocated to the homeowner, who is in the best position to inspect the premises and make necessary repairs. The court disagreed:

> We do not view the imposition of a duty to undertake a reasonable broker's inspection of a home for purposes of its sale to customers, and to give adequate warnings with respect to hazards readily discoverable through such an inspection, to be an unreasonable economic strain on a broker's livelihood. Given the economic benefits that inure to the broker from the open house itself, to ask the broker to internalize the costs associated with conducting its business is reason-

able and fair. Moreover, it is not at all likely that the broker would be solely responsible for the increased costs that may be associated in responding to such a duty of care. The actual owner, as earlier noted, remains primarily liable for the safety of all invitees on the property, including open-house visitors.

> A broker may still retain a right of either contribution or indemnification from the homeowner, in the case of shared liability for a visitor's injury. Moreover, principles of comparative negligence also serve to distribute the costs and burdens of accidental injury among all involved parties. Liability for resultant injury should mirror the responsibilities of the participants and be apportioned in accordance with their combined fault.

625 A.2d at 1119–20 (quotation omitted). It recognized "the salutary effect of shifting the risk of loss and other associated costs of a dangerous activity to those who should be able and are best able to bear them." Id. at 1120.

The Hopkins dissent agreed, as do we, with the realtor's claim that the duty to inspect amounts to an unjustifiable economic burden on the residential real-estate industry but offers little or no added benefit to society. Real estate agents would not only have to develop an expertise in home inspection but would be saddled with the additional costs of liability insurance and accident-prevention measures, which would presumably be passed on to the consumer in one form or another. This "imposes an expansive, ambiguous, and vague liability on real-estate brokers for injuries sustained by an open-house visitor." Id. at 1123 (Garibaldi, J., dissenting).

The dissent further noted:

> Because of the newly-created duty to inspect and warn, brokers forced to de-

fray the cost of the additional liability insurance will simply add costs to the commission. Moreover, as the majority recognizes, the broker still would retain the right of either contribution or indemnification from the homeowner. Thus, in the end, the homeowner will pay even more to insure against injuries that might occur in the home, while the brokers will have no more incentive to inspect and warn than they did before today's decision.

In addition, the smart homeowner, saddled with new costs, will simply increase the asking price for the house. Therefore, the potential buyer will have to pay more for a house, which has had costs added to the purchase price, all in the name of the buyer's protection.

Rather than serving the public, the majority's decision will add extra layers of litigation, paperwork, and cost to the already complex and expensive process of selling and buying a house.

*Id.* For the reasons articulated in the *Hopkins* dissent, we decline to impose such a duty on real estate brokers who do not have sufficient control over the premises to independently give rise to a duty to warn under recognized premises liability principles.

■■■ While we decline Masick's invitation to impose on real estate brokers a duty to inspect premises they show to prospective buyers, we believe a broker is obliged to warn a prospective buyer of a latent defect in the premises when the broker is aware of it. In the case before us evidence was designated that a Saxon worker advised McColly's broker, while Masick was in the room, that the step was not sturdy and the broker should be careful. We therefore find there is a genuine issue of material fact as to whether such a duty arose and whether the McColly agent

breached it. Summary judgment for McColly was therefore improper.

The scope of a broker's duty to warn was articulated in *Merrill v. Buck,* 58 Cal.2d 552, 25 Cal.Rptr. 456, 375 P.2d 304, 310 (1962), *reh'g denied:*

> The case is admittedly one without exact precedent, but we are satisfied that, having affirmatively undertaken to show the house to plaintiff in the regular course of their business with the purpose of earning a commission if she decided to rent it, these defendants were under a duty of care to warn her of a concealed danger in the premises of which they were aware and from which her injury might be reasonably foreseen if she did become a tenant. It was for the jury to determine the extent of the hazard, the question of latency, and the character of the conduct of these defendants necessary to constitute the exercise of reasonable care under all of the circumstances.

This duty is similar to one we have recognized on the part of landlords:

> This court has often repeated the exception that a landlord has a duty to warn the tenant of hidden defects known to the landlord but unknown to the tenant ... the hidden defect exception to the rule of caveat lessee requires actual knowledge of the hidden defect on the landlord's part before a duty to warn of the defect arises. It is not enough that the landlord should have known of the hidden defect. No duty to warn arises and no liability accrues if the landlord is without actual knowledge of the latent defect.

*Dickison v. Hargitt,* 611 N.E.2d 691, 694–95 (Ind.Ct.App.1993) (citations omitted). As there was designated evidence the McColly broker did not warn Masick about a latent defect of which the Saxon worker had made her aware, we reverse the summary judgment for McColly and remand

so the factfinder may "determine the extent of the hazard, the question of latency, and the character of the conduct of these defendants necessary to constitute the exercise of reasonable care under all of the circumstances." *Merrill,* 25 Cal.Rptr. 456, 375 P.2d at 310.

### 3. *Assumption of Duty*

■ Masick asserts even if McColly's agent did not have a common-law duty to warn Masick about the step, she "assumed a gratuitous duty of due care." (Appellant's Br. at 22.) The agent did so, Masick asserts without explanation or citation to authority, because "she tells prospective homebuyers that there may be certain dangers in the house that they should watch out for." (*Id.*) This is insufficient to demonstrate McColly assumed a duty to warn Masick.

■ A duty to exercise care and skill may be imposed on one who, by affirmative conduct, assumes to act, even gratuitously, for another. *Hous. Auth. of City of South Bend v. Grady,* 815 N.E.2d 151, 160 (Ind.Ct.App.2004). The actor must specifically undertake to perform the task he is charged with having performed negligently, for without actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully. *Id.* In other words, the assumption of a duty creates a special relationship between the parties and a corresponding duty to act in a reasonably prudent manner. *Id.* The existence and extent of such duty are ordinarily questions for the trier of fact, but when there is no genuine issue of material fact, assumption of a duty may be determined as a matter of law.

In *McClure v. Strother,* 570 N.E.2d 1319, 1321 (Ind.Ct.App.1991), McClure fell from a ladder when one end sank into the mud. We found Strother's assurances the ground was firm enough to support McClure's weight on the ladder did not amount to the gratuitous assumption of a duty to provide a safe work place. "That doctrine applies to cases in which the landowner actually takes affirmative steps to provide for on-the-job safety." *Id.*

We decline to hold McColly's broker gratuitously assumed a duty to warn Masick of the defective step based on the broker's statement she typically tells prospective homebuyers they should "watch out" for dangers in the houses she shows.

### CONCLUSION

Neither McColly nor Saxon exercised sufficient control over the premises to give rise to a duty, under premises liability standards, to warn Masick about the step. We decline to impose on real estate brokers an independent duty to inspect properties they show and to warn prospective customers about dangerous conditions they so discover, and McColly's agent did not gratuitously undertake such a duty. However, we hold a real estate broker, like a prospective landlord, has a duty to warn a prospective buyer of hidden defects known to the broker but unknown to the tenant. We accordingly affirm summary judgment for Saxon but reverse summary judgment for McColly.

Affirmed in part, reversed in part, and remanded.

BAILEY, J., and RILEY, J., concur.