ATTORNEYS FOR APPELLANT
Tracy D. Knox
D. Michael Anderson
South Bend, Indiana

ATTORNEY FOR APPELLEES
Patrick F. O'Leary
Goshen, Indiana

# In the
# Indiana Supreme Court

No. 20S05-0506-CV-292

DUTCHMEN MANUFACTURING, INC.,

*Appellant (Defendant below),*

v.

CHAD REYNOLDS AND DON REYNOLDS,

*Appellees (Plaintiffs below).*

Appeal from the Elkhart Superior Court, No. 20D04-0011-CP-171
The Honorable Olga H. Stickel, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 20A05-0404-CV-202

**June 22, 2006**

**Boehm, Justice.**

We hold that tort liability of a tenant who leaves a dangerous item on the leased premises at the expiration of a lease is not extinguished by reason of the expiration of the lease. We also hold that a provision in a lease to a successor tenant that the item is acquired "as is" does not of itself bar a tort claim asserted by a non-contracting party.

**Facts and Procedural History**

Dutchmen Manufacturing, Inc., is a manufacturer of recreational vehicle travel trailers and fifth wheels. From April 1992 until February 1999 Dutchmen leased a facility in Goshen, Indiana, from Chapman Realty, Inc. At some point during its tenancy, Dutchmen employees in-

stalled scaffolding which was affixed to the ceiling beams without Chapman's knowledge or consent. The identities of the employees who performed the assembly and the time it was done are not known according to Dutchmen.

Dutchmen's lease required that it remove all personal property and trade fixtures before vacating the premises. Any property not removed would become the property of Chapman, and the lease also gave Chapman the right to require removal at Dutchmen's expense.

Chapman had initially told Dutchmen to remove the scaffolding or pay for its removal, which was estimated to cost $4,200. Shortly before the lease expired, Chapman began negotiating to lease the premises to Keystone RV, Inc., a manufacturer of travel trailers and Keystone expressed a desire that the scaffolding be left in the building. Dutchmen first offered to sell the scaffolding to Keystone, and when that proposal was rejected offered to give the scaffolding to Keystone if Chapman would not charge Dutchmen for its removal.

Dutchmen vacated the premises on February 28, 1999 leaving the scaffolding in place. Two weeks later, Keystone signed a lease with Chapman and took possession of the premises on May 3. Under its lease, Keystone accepted the premises from Chapman "AS IS." Keystone's chairman supplied an affidavit that it was his understanding that Keystone "accepted and took possession of the scaffolding . . . at its own risk, regardless of whether the scaffolding contained defects or deficiencies."

In December 1999, Chad Reynolds, a Keystone employee, was installing electric wiring in a trailer under assembly. Scaffolding broke loose from its mounting and struck Reynolds rendering him paralyzed below the neck. According to Keystone's employee injury report, a weld in the scaffolding had failed. Keystone's engineers determined that an inner steel tube had fractured due to lack of lubricant and "improper welding procedure." The inner tube was concealed from view by an outer tube and an end cap when the unit was assembled.

2

In November 2000, Reynolds[1] filed a complaint against Chapman and Dutchmen, alleging, among other things, that Dutchmen was liable for the injuries because it had constructed and installed defective scaffolding in the building that it had formerly leased from Chapman. Dutchmen moved for summary judgment, arguing that it did not owe Reynolds any duty and was not negligent per se. At the hearing on that motion, Reynolds filed a supplemental memorandum of law, alleging for the first time that Dutchmen was liable as a supplier of a defective chattel under section 388 of the Restatement (Second) of Torts. Dutchmen responded that the scaffolding was not a chattel, and that Keystone was aware of the dangers of the scaffolding and had accepted the premises and scaffolding "as is." The trial court granted Dutchmen's motion for summary judgment with respect to Reynolds' negligence per se claim and all theories of negligence except for the section 388 claim. On interlocutory appeal, the Court of Appeals reversed and remanded to the trial court with direction to enter summary judgment for Dutchmen on all theories, including the section 388 claim. Dutchmen Mfg., Inc. v. Reynolds, 819 N.E.2d 529, 533 (Ind. Ct. App. 2004). The Court of Appeals held that the scaffolding had merged into the real estate at the expiration of Dutchmen's lease, and Reynolds therefore could not recover on the theory that Dutchmen had supplied a defective chattel. Id. at 532. We granted transfer. Dutchmen Mfg., Inc. v. Reynolds, 831 N.E.2d 750 (Ind. 2005).

### Standard of Review

Reynolds' section 388 claim is the only issue in this interlocutory appeal. Dutchmen argues that the trial court erred in denying its motion for summary judgment and the Court of Appeals agreed. On review of a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court: we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to judgment as a matter of law. Carie v. PSI Energy, Inc., 715 N.E.2d 853, 855 (Ind. 1999). We will construe the designated evidence in a light most favorable to the non-moving party. Id.

### I. Restatement (Second) Torts Section 388

---

[1] Chad was nineteen years old when the complaint was filed, and Don Reynolds was a named plaintiff in his capacity as Chad's father. See Ind. Code § 34-23-2-1 (2004). For simplicity, we refer to the plaintiffs collectively as "Reynolds."

Section 388 of the Restatement (Second) of Torts provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

A. *Merger of the Scaffolding into the Real Estate*

A "chattel" is "movable or transferable property; personal property." Black's Law Dictionary 251 (8th ed. 2004). The parties agree that the scaffolding is a trade fixture. A "trade fixture" is "personal property put on the premises by a tenant which can be removed without substantial or permanent damage to the premises." 14 Ind. Law Encyclopedia, Fixtures § 14 at 137 (West 2004). Thus, the scaffolding was a chattel at the time of Dutchmen's occupancy.

Dutchmen argues, however, that the scaffolding merged into the realty and title to the scaffolding vested in Chapman when Dutchmen vacated the premises and Keystone had not yet signed its lease with Chapman. Therefore, Dutchmen reasons, the scaffolding was realty and not a "chattel" at the time of the accident and section 388 is inapplicable. Reynolds responds that Dutchmen did not abandon the scaffolding, so it remained a chattel at the expiration of Dutchmen's lease. Reynolds argues, that Dutchmen transferred ownership of the scaffolding to Keystone with the consent of Chapman in order to avoid incurring the expense of its removal, and this arrangement was consummated before Dutchmen vacated the premises.

The parties discuss this issue in terms of ownership of the asset, citing cases dealing with title to fixtures and similar property where the landlord and the tenant dispute ownership after expiration of a lease. It is true, as the Court of Appeals held in this case, that a trade fixture installed by a tenant merges with the realty and thereby becomes the property of the landlord if it is left on the premises after the tenant leaves the premises. The cases cited by the parties typically

4

deal with a situation where the tenant has enhanced the real estate and the landlord claims title by "merger" to structures or improvements that the tenant had not removed. Chapman apparently viewed the scaffolding as a liability, not an asset, because it demanded removal and claimed a right to charge Dutchmen with the cost of removal if Dutchmen did not remove it at the expiration of the lease. Chapman then located a prospective tenant that affirmatively wanted the scaffolding. At least one inference is that Chapman had no interest in obtaining title to the scaffolding and intended to demand removal when Dutchmen vacated the premises, but then arranged for Dutchmen to transfer the scaffolding to Keystone to avoid the cost of removal.

The documents before us make no specific reference to the scaffolding in the arrangement between Keystone and Chapman, and in particular do not specifically address interest in the scaffolding. It is clear, however, that Chapman disclaimed ownership of the scaffolding and demanded its removal which, if not done, would be performed at the tenant's expense.

A tenant may remove buildings or improvements pursuant to the terms of its lease, but failure to do so ordinarily causes title to the improvements to merge into the real estate. Merrell v. Garver, 54 Ind. App. 514, 525, 101 N.E. 152, 156 (1913). See also William M. Howard, Time Within Which Tenant's Right to Remove Trade Fixtures Must Be Exercised, 109 A.L.R. 5th 421 (West 2003). However, a landlord may expressly or implicitly allow a tenant an extension of time beyond the term expressed in contract for the removal of improvements without forfeiture. Merrell, 54 Ind. App. at 525, 101 N.E. at 156. A landlord's consent that trade fixtures may remain on the premises after the expiration of the lease causes ownership of them to remain preserved in the tenant, and the tenant has the right to remove the fixtures from the leased premises within a reasonable time after termination of the tenancy.[2] This is an application of the general

---

[2] See Revzen Bus. Interiors, Inc. v. Carrane, 391 N.E.2d 24, 26 (Ill. App. Ct. 1979) (former tenant was allowed a reasonable time after its tenancy expired to recover an air conditioning unit it had installed during its tenancy because of representations by the landlord that arrangements would be made with a subsequent tenant for the purchase of the air conditioning unit); Yorkshire Ice Co. v. Flanagan, 163 N.Y.S. 212, 213-14 (N.Y. App. Div. 1917) (tenant had right to remove trade fixtures shortly after the expiration of its lease because the landlord had consented to the fixtures being left); Finley v. West, 467 P.2d 169, 172 (Okla. 1970) (ownership of trade fixtures remained with former tenant because landlord implicitly consented to the fixtures being left on the premises after the lease terminated when the landlord stated that the next tenant would like the fixtures to remain and would be willing to pay for them); Stopper v. Kantner, 29 Pa. Super. 48, 56 (Pa. Super. Ct. 1905) (tenant had the right to remove his trade fixtures after the termination of his tenancy when the landlord had given the tenant permission to remove his trade fixtures during the three days immediately following the expiration of his term, but forcibly prevented him from

5

proposition that "performance within the time specified by a contract may be waived by the conduct of the other party." Kenefick v. Schumaker, 64 Ind. App. 552, 560, 116 N.E. 319, 322 (1917).

We think a fair inference from this evidence is that Chapman consented to Dutchmen's leaving the scaffolding in the building after the lease expired. If so, title to the scaffolding never vested in Chapman and was transferred directly from Dutchmen to Keystone. Indeed, the affidavit of Keystone's chairman refers to Keystone's taking "ownership" of the scaffolding at the time it occupied the building. If the scaffolding had passed to Chapman and was governed by the lease to Keystone, Keystone would be its lessee, not its owner. Given that Dutchmen left the scaffolding at Chapman's request to accommodate Keystone's desires and to avoid the cost of removal, we think that view of these facts is plausible and, if so, no merger occurred.

In any event, we do not regard the legal title to fixtures to be the controlling consideration for purposes of section 388 tort liability. One who supplies a chattel for purposes of section 388 has liability whether or not the chattel is incorporated into the real estate. Dutchmen was a "supplier" as that term is used in section 388, and Dutchmen does not contend otherwise. Comment c of section 388 defines a "supplier" as "any person who for any purpose or in any manner gives possession of a chattel for another's use. . . . These rules, therefore, apply to sellers, lessors, donors, or lenders." Dutchmen was not only the manufacturer of the scaffolding, it also turned the scaffolding over for Keystone's "use" in return for consideration (avoiding the cost of removal). The scaffolding therefore was not simply abandoned property at the expiration of Dutchmen's lease, which we assume, without deciding, would not ordinarily render an exiting tenant a "supplier."

Section 388 sets out a tort doctrine that places a loss on the party who caused it. The niceties of real estate title—specifically incorporation into realty–produce no different result. A supplier of a chattel is not freed from section 388 liability because the chattel is incorporated into another chattel. See, e.g., McGlothlin v. M & U Trucking, Inc., 688 N.E.2d 1243, 1245 (Ind.

doing so); Merriam v. Ridpath, 47 P. 416, 417 (Wash. 1896) (despite explicit language in the lease to the contrary, the tenant was allowed a reasonable time to remove his fixtures from the leased premises beyond the expiration of the lease because negotiations between the landlord and current and future tenants regarding transferred ownership of the fixtures began before the lease expired).

6

1997) (possible section 388 liability whether or not added landing gear was incorporated into semi-trailer). Similarly, a supplier of defective electrical wiring cannot be immunized from liability because the wiring is installed in a building and becomes realty for purposes of property law.

Because we draw factual inferences in favor of the non-moving party, summary judgment for Dutchmen cannot be affirmed on the merger theory. The designated evidence permits the inference that the intention of all three parties involved was that Keystone would obtain ownership of the scaffolding if and when it signed its lease with Chapman. The arrangement effectively allowed Dutchmen an extension of time past the conclusion of the lease for removing the scaffolding and was for the benefit of all three. Had the lease between Keystone and Chapman not been consummated, Dutchmen would have had a reasonable time to remove the scaffolding or pay for its removal. Merrell, 54 Ind. App. at 526, 101 N.E. at 157 (when the time for removal is not clear, the removal should be "effected within a reasonable time"). Under that view, the scaffolding did not merge into the real estate and was Dutchmen's chattel until Keystone signed its lease with Chapman. But whether or not the scaffolding merged into the real estate, it was a chattel at the time it was supplied to Keystone and is susceptible to a section 388 claim.

B. *Elements of a Section 388 Claim*

Section 388 imposes liability on a supplier of a chattel for physical harm caused by the supplier's "failure to exercise reasonable care" to provide to any expected user of the chattel any information as to the "character and condition of the chattel . . . which [the supplier] should recognize as necessary to enable [the user] to realize the danger of using it." Restatement (Second) Torts § 388 cmt. b. A supplier of a chattel has no duty to warn of an obvious hazardous condition which a "mere casual looking over will disclose." Id. at cmt. k; R. D. Hursh, Manufacturer's or Seller's Duty to Give Warning Regarding Product as Affecting His Liability for Product-Caused Injury, 76 A.L.R. 2d 9, 28 (1961). Moreover, a supplier is not required "to warn a person who in his occupation or profession regularly uses the product against any risk that should be known to such a regular user." 63 Am. Jur. 2d Products Liability § 51, at 61 (1972). However, in McGlothlin, we held that section 388 imposes a duty on the supplier of a chattel to conduct a proper inspection which would disclose the existence of a defect. 688 N.E.2d at 1245.

Comment m of section 388 states that subsection (c) of that section imposes a duty on the supplier to inspect the materials and parts out of which the chattel is made and conduct a reasonable inspection of the finished chattel.

Dutchmen argues that Reynolds' section 388 claim fails because Dutchmen had no reason to know the weld on the scaffolding was defective and had no reason to believe that those using the scaffolding would fail to realize its dangerous propensities. Reynolds does not deny that Keystone and its employees knew of the potential dangers generally associated with the use of scaffolding. However, Reynolds contends that despite Keystone's inspections of the scaffolding, because an outer tube and end cap were placed over the defective weld, Keystone was unaware of that defect and the lack of adequate lubricant in the joints. Reynolds contends that only the designers and constructors of the scaffolding, who were Dutchmen employees, could have known of the improper weld and thus the particular associated danger.

The trial court found that "there has been no evidence designated establishing that Dutchmen had actual knowledge of the alleged welding defects in the scaffolding." However, Reynolds provided expert opinion that the defect in the weld that led to the collapse was so poor in appearance that the allegedly defective weld "should have been visibly obvious" to the welder at the time of manufacture when the inner tube was still visible.

A negligence claim under section 388 may be based upon the supplier's actual or constructive knowledge of the danger. Bogard v. Mac's Rest., Inc., 530 N.E.2d 776, 780 (Ind. Ct. App. 1988), trans. denied (claimant must show supplier knew or had reason to know chattel was dangerous for its intended use); Lamb v. Manitowac Co., Inc., 570 N.W.2d 65, 68 (Iowa 1997) (same); Hanlon v. Lane, 648 N.E.2d 26, 28 (Ohio Ct. App. 1994) (same). Dutchmen argues that its only duty was to warn Keystone of the scaffolding's general dangers, and since it did not know of any danger that was not already apparent to Keystone, this duty was not breached. The evidence viewed in a light most favorable to Reynolds permits the inference that Dutchmen negligently welded the scaffolding, and also failed to conduct a reasonable inspection of the scaffolding and ensure adequate lubricant. This is sufficient to deny summary judgment on the ground that Dutchmen had no knowledge of the defect.

## II.     Assumption of Risk

Dutchmen argues that section 388 does not impose liability on it because Keystone contractually accepted the premises, which included the scaffolding, "as is" and contractually assumed any risks associated with the scaffolding. There was no written contract between Keystone and Dutchmen. Keystone's lease with Chapman provided that Keystone acquired the premises "as is." The "as is" language in Keystone's lease with Chapman is contained in the section of the lease entitled "Lessee's Examination of Premises, Maintenance and Repair," which is also found in Dutchmen's lease with Chapman.

Based on the "as is" clause, Dutchmen argues that Keystone "contractually assumed any risks associated with the scaffolding." There are several reasons why this contention does not support summary judgment. First, if the scaffolding passed directly from Dutchmen to Keystone, it was not a part of "the premises" leased by Chapman to Keystone and was not the subject of the "as is" clause. Second, in order to effectuate an exemption from liability for the consequences of negligence, a provision for such an exemption must clearly express an intention to exclude liability for any and all harms however caused. Arthur Linton Corbin, 6A <u>Corbin on Contracts</u> § 1472 (1962). The "as is" language in the lease between Chapman and Keystone serves to disclaim any implied warranty from Chapman to Keystone. "As is" means "in the existing condition without modification." <u>Black's Law Dictionary</u> 121 (8th ed. 2004). "Generally, a sale of property 'as is' means that the property is sold in its existing condition," and use of the phrase "as is" relieves the seller from liability to the purchaser for defects in that condition. <u>Id.</u> at 122. Expressions such as "as is" or "with all faults" are commonly understood to exclude implied warranties. <u>See</u> <u>Warner v. Design & Build Homes, Inc.</u>, 114 P.3d 664, 668 (Wash. Ct. App. 2005); 17A C.J.S. <u>Contracts</u> § 359 at 403 (1999). The implications of such a disclaimer as to third party tort claims are not clearly spelled out and as elaborated below, are not made clear by settled judicial precedent.

More, importantly, even if we construe the "as is" clause as an attempt to bar such claims, an agreement between Keystone and Chapman or Keystone and Dutchmen does not bar Reynolds' tort claim against Dutchmen. Dutchmen is correct that contracting parties are free to allocate risks as they choose. But that freedom extends only to allocation of risk as among the parties to the agreement. Parties cannot by agreement transfer risk from themselves to non-

9

parties.[3]  Keystone could indemnify Dutchmen against third party claims, but Keystone cannot waive its employees' rights against Dutchmen.[4]  Keystone can agree to indemnify Dutchmen against claims by Keystone employees.[5]  Even if we take the agreement to lease the premises "as is" to imply such an indemnity as to the scaffolding, an employer's decision to indemnify a third party does not limit an employee's tort claim against the third party.  See, e.g., Waters v. Puget Sound Power & Light Co., 924 P.2d 925, 926 (Wash. Ct. App. 1996) (employer's agreement to indemnify a third party is not enforceable to bar tort claims brought by its employees against the third party); 7 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law, § 121.04D (2005).

We find little case law on the effect of an "as is" clause on tort liability to third parties. Dutchmen cites this Court's decision in Stapinski v. Walsh Construction Co., Inc., 272 Ind. 6, 395 N.E.2d 1251 (1979) for the proposition that one who sells "as is" has no duty to an injured bystander.  In Stapinski an employee was injured when the drive shaft of an automobile broke loose and flew through the windshield.  The employer had purchased the automobile fifteen months prior to the incident and signed a contract stating that it was purchasing the vehicle "as is, where is."  Id. at 1252.  The injured employee sued the former owner of the automobile under section 388 and alleged that the shaft broke because of failed maintenance by the former owner. Id.  We held that section 388 did not impose liability on the former owner because the purchaser used the trucks on the highways with knowledge that it had never been on public highways and had been responsible for maintenance of the automobile for over a year before the injury, and

---

[3] See Rhodes v. Wright, 805 N.E.2d 382, 385 (Ind. 2004) ("A person cannot limit his or her tort law duty to third parties by contract."); Young v. Tri-Etch, Inc., 790 N.E.2d 456, 459 (Ind. 2003); Morris v. McDonald's Corp., 650 N.E.2d 1219, 1221-23 (Ind. Ct. App. 1995) (plaintiff injured at a franchised McDonald's restaurant could sue McDonald's despite waiver and indemnity clauses in contract between McDonald's and franchise operator because injured plaintiff was not a party to that contract).

[4] See, e.g., Folstad v. Eder, 467 N.W.2d 608, 612 (Minn. 1991) (Employer waived its right to sue third party when it settled a subrogation claim with the third party prior to the commencement of trial in the employee's direct tort suit.  The employer's waiver did not affect the employee's right to bring the tort claim against the third party).

[5] See, e.g., Borroel v. Lakeshore, Inc., 618 F. Supp. 354, 358-59 (D. Colo. 1985) (an express contract of indemnity is an exception to the rule that the employer is immune from suits by a third party who is held liable for an employee's workplace injury); Gen. Tel. Co. of the S.E. v. Trimm, 311 S.E.2d 460, 462 (Ga. 1984) (an express contract of indemnity can be enforced by a third party against an employer who has paid workers' compensation benefits to an employee); Rucker Co. v. M & P Drilling Co., 653 P.2d 1239, 1241 (Okla. 1982) (an injured employee filed an action against his employer's supplier and the supplier cross-petitioned for indemnity from the employer); Enserch Corp. v. Parker, 794 S.W.2d 2, 8 (Tex. 1990) (same); 7 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law, § 121.04D[2] (2005).

had purchased the vehicle "as is." Id. at 1254. We upheld summary judgment for the former owner, citing an Ohio case which held that an owner of a used truck who sold the same "as is" to a dealer is not ordinarily liable for injuries to a purchaser from the dealer. Id. at 1253 (citing Thrash v. U-Drive-It Co., 110 N.E.2d 419, 423 (Ohio 1953)). Although Stapinski did not involve a sale by a dealer who may be expected to inspect and repair before reselling, we found that the former owner was not liable essentially based on the proposition that where there is "'another conscious and responsible agency which could and should have eliminated the hazard, the original agency is relieved from liability.'" Id. (citing Thrash, 110 N.E.2d at 422).

Dutchmen is correct in pointing out that Stapinski noted the employer's agreement to purchase the vehicle "as is." But this factor was cited among others and in isolation Stapinski did not find it sufficient to eliminate any liability of the seller to bystanders, employees or other third parties in the scope of the risk. To the contrary, we think the holding in Stapinski is grounded largely on the employer's obligation to maintain the vehicle coupled with the employee's use of the truck on public highways, both of which amounted to intervening circumstances.

Dutchmen's reliance on landlord-tenant cases is also misplaced. It is true, as Dutchmen contends, that a landlord under many circumstances has no liability to tenants or others for injuries on the property when the tenant is in full control of the leased premises. But the case Dutchmen cites for this proposition deals with injuries due to snow removal that was the tenant's obligation. See Smith v. Standard Life Ins. Co., 687 N.E.2d 214, 217 (Ind. Ct. App. 1997). Dutchmen does not address Reynolds' claim that the concealed defect in the scaffolding was not susceptible of discovery by Keystone or Reynolds in the ordinary course of maintenance.

Finally, Dutchmen also cites the affidavit of Keystone's chairman that:

> Keystone's understanding was that, if it accepted the Scaffolding from Dutchmen or Chapman, Keystone would be accepting and taking possession of the Scaffolding on an "AS IS" basis.

> More specifically, Keystone's understanding was that, if it accepted and took possession of the Scaffolding, it was doing so at its own risk, regardless of whether the Scaffolding contained defects or deficiencies.

11

Reynolds responds that the chairman was not present during the lease and scaffolding negotiations and that acceptance of the scaffolding "as is" was never discussed in the negotiations. But even if we take the chairman's affidavit as reflecting some form of agreement between Chapman and Keystone or Keystone and Dutchmen, it does not support summary judgment as to Reynolds. The affidavit is ambiguous and may be construed as either a disclaimer of warranties, an indemnity of Chapman and/or Dutchmen, or an effort to bar third party claims. For reasons already given, none of these would bar Reynolds' claim.

## Conclusion

The ruling of the trial court denying Dutchmen's summary judgment motion on Reynolds' section 388 of the Restatement (Second) of Torts claim is affirmed. This case is remanded to the trial court.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ. concur.

12