**DUTCHMEN MANUFACTURING, INC., Appellant–Defendant,**

v.

**Chad REYNOLDS, Appellee–Plaintiff.**

No. 20A03–0711–CV–510.

Court of Appeals of Indiana.

Aug. 11, 2008.

Tracy D. Knox, D. Michael Anderson, Barnes & Thornburg LLP, South Bend, IN, Attorneys for Appellant.

Michael F. DeBoni, John D. Ulmer, Yoder, Ainlay, Ulmer & Buckingham, Patrick F. O'Leary, Goshen, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-defendant Dutchmen Manufacturing, Inc. (Dutchmen), appeals the $6 million jury verdict entered against it in favor of appellee-plaintiff Chad Reynolds as the result of injuries that Reynolds sustained while working near some scaffolding that Dutchmen personnel had installed. Specifically, Dutchmen argues that: (1) the trial court erred in denying its motion for a judgment on the evidence; (2) the jury was improperly instructed; (3) the trial court erred in denying its motion for a mistrial because of opposing counsel's allegedly improper comments; and (4) the jury's damage award was excessive. Concluding that the trial court properly denied Dutchmen's motion for judgment on the evidence and finding no other error, we affirm.

## FACTS [1]

Dutchmen was a tenant in a recreational vehicle (RV) manufacturing facility in Goshen, which was known as the Maple City Plant. While Dutchmen was leasing the facility, which was owned by Chapman Realty, it constructed some scaffolding and installed several work platforms for use in the manufacturing process. Specifically, in 1992, Dutchmen delegated the task of constructing the scaffolds to Rick Mosher, who worked in the company's maintenance department. Prior to erecting the scaffolds at the Maple City Plant, the only fixtures that Mosher had built for Dutch-

men from "scratch" were metal storage shelves. Appellant's App. p. 23. Dutchmen representatives knew that Mosher chose plumbing pipe for the scaffolding, which is a poor weight-bearing steel material.

After Mosher completed the first scaffold, he delegated construction of the other platforms to Alan Pfeiffer, a welder. Like Mosher, Pfeiffer had no prior experience in designing or fabricating scaffolds or work platforms. The scaffolds were mechanical platforms that hung from the ceiling and could be raised and lowered. The scaffolds were typically set at a working height of six feet but could be raised to a height of nine feet to permit the workers to pass directly underneath them. Dutchmen personnel did not inspect or maintain the scaffolding after the units were built.

Although Mosher claimed that the scaffolds were designed to hold two workers, there were occasions where he and other employees saw three or four workers on them at once. Mosher and others also observed workers jumping approximately five feet from the top of the trailers onto the deck of the platform. The impact from the jumping caused the building to shake, and Mosher often heard the vibrations over the production noise of the plant. Mosher reported this activity to his supervisor, and Dutchmen's managers issued an order prohibiting the jumping.

In early 1999, Dutchmen planned to vacate the Maple City Plant at the expiration of its lease. Chapman Realty informed Pfeiffer, the current plant manager, that pursuant to the terms of the lease, Dutchmen either had to remove the scaffolds or reimburse Chapman Realty for the ex-

---

1. We heard oral argument on July 1, 2008, in Indianapolis, and we commend counsel for their able presentations. In accordance with Indiana Admission and Discipline Rule 3(2), we granted attorney John S. Sandberg's Petition for Temporary Admission in these proceedings to appear on Dutchmen's behalf.

pense of removing them. Chapman had initially told Dutchmen to remove the scaffolding or pay for its removal, which was estimated at a cost of $4200. However, to avoid the removal expenses, Pfeiffer initially attempted to sell the scaffolds to Keystone RV (Keystone), a company that expressed an interest in occupying the premises. However, when Keystone and Dutchmen could not agree about the price of the platforms, Dutchmen ultimately agreed to give the scaffolds to Keystone.

Sometime in February 1999, Dutchmen terminated its lease and vacated the Maple City Plant, and left the work platforms at the facility. Thereafter, Keystone moved in and used the platforms in its manufacturing process beginning May 3, 1999.

On December 14, 1999, Reynolds was working in the bay of the electrical department at the back end of a trailer. As Reynolds bent down to install a taillight on the trailer, the inner support pipe of a nearby scaffold suddenly broke, causing it to fall and strike Reynolds on the head. As a result of the fall, Reynolds sustained a severe spinal cord injury.

According to Keystone's employee injury report, a weld in the scaffolding had failed, causing the scaffold to fall to the floor. More specifically, the report indicated that "a pipe inside the support tube for the center arm of the scaffold broke." Appellant's App. p. 424. Keystone's engineers determined that the inner tube fractured due to "improper welding procedure." *Id.* at 373. It was also established that Keystone personnel could not have discerned that the primary support components of the scaffolding were not the type that should have been used to construct the platforms. Moreover, it was determined that a weld was made at the intersection of the inboard side of the inner pipe and vertical arm. As a result, the scaffolding was weakened, and the defec-

tive weld was completely concealed from view by the outer tube and an end cap at the time the unit was assembled.

In November 2000, Reynolds filed a complaint against Chapman Realty and Dutchmen, alleging that Dutchmen was liable for his injuries because it had constructed and installed defective scaffolding on the premises. Thereafter, Reynolds filed a two-count amended complaint against Dutchmen on July 5, 2001, which advanced claims for negligence and negligence per se. Subsequently, Dutchmen moved for summary judgment, arguing that it did not owe Reynolds any duty and was not negligent per se. In response, Reynolds filed a memorandum of law alleging that Dutchmen was liable for his injuries as a supplier of a defective chattel in accordance with Section 388 of the Restatement (Second) of Torts (Section 388). Section 388, which is discussed in greater detail below, essentially provides that one who provides a chattel to a third person is subject to liability for physical harm caused by the use of the chattel if the supplier knew it was likely to be dangerous and had no reason to believe the other party would realize it was dangerous.

Following a summary judgment hearing on December 11, 2002, the trial court granted Dutchmen's motion with regard to all of Reynolds's negligence claims. Specifically, the trial court's order provided that

7. Plaintiffs advance various theories of liability with respect to their negligence claim against Dutchmen. First, Plaintiffs contend that Dutchmen is liable under the theory of premises liability.... It is undisputed that Dutchmen relinquished absolute possession and control of the premises and the scaffolding when its lease with Chapman Realty expired. Therefore, Dutchmen had neither possession nor

control of the premises or the scaffolding at the time of Chad Reynolds's accident. There is no evidence that would suggest otherwise. Thus, Dutchmen was in no position to discover, repair or prevent any unsafe condition of the scaffolding. Once Dutchmen relinquished possession and control of the premises, including the scaffolding, it had no duty to the entrants or employees on those premises. Accordingly, Plaintiffs' premises liability claim fails.

8. Dutchmen was not a vendor of land or a seller of real estate. Further, it is undisputed that Dutchmen made no representations to Keystone regarding the condition of the scaffolding. Finally, when Keystone leased the premises, including the scaffolding from Chapman Realty, it was offered the opportunity to examine and expressly accepted the property "AS IS." Dutchmen did not have a duty as vendor of land to disclose to Keystone the condition of the scaffolding.

9. Further, Plaintiffs contend that Dutchmen is strictly liable in tort under the Indiana Product Liability Act ... as a seller or manufacturer of a product in a defective and/or unreasonably dangerous condition.... Based on the lack of any evidence to the contrary, the Court concludes that Dutchmen is not engaged in the business of constructing and/or selling the scaffolding which is the subject of this litigation, for resale, use or consumption. The incident in this case was an isolated dealing and Dutchmen is not a seller or manufacturer of a product which would invoke the Indiana Product Liability Act.

10. As a final component of their general negligence claim, Plaintiffs assert that Dutchmen remained liable because the scaffolding Dutchmen constructed was "inherently dangerous." Plaintiffs' designated evidence ... reveals that the scaffolding in this case was defective. If the scaffolding was defective, as a matter of law, it cannot be "inherently dangerous." Unless the instrumentality or work is deemed inherently dangerous, a duty is not owed under § 385 after the owner accepts the work. By analogy, after Keystone accepted the scaffolding from Dutchmen, Dutchmen owed no duty to the Plaintiffs under this theory.

11. Plaintiffs advance the theory that Dutchmen is liable for negligence under the Restatement (Second) of Torts § 388, which imposes liability on a supplier of goods known to be dangerous for an intended use when it does not use reasonable care to inform the consumer of the facts that make the chattel dangerous.... The evidence designated supports the Court's conclusion that the scaffolding in this case is a chattel.... Plaintiffs' claim under § 388 is broader than a claim for strict liability imposed on sellers and manufacturers under the Indiana Product Liability Act. Under § 388, a supplier is any person who for any purpose or in any manner gives possession of a chattel for another's use, or who permits another to use or occupy it while it is in his own possession or control, without disclosing his knowledge that the chattel is dangerous for the use for which it is supplied or for which it is permitted to be used.... Section 388 contemplates supplier status for those parties that supply a dangerous chattel for the use for which it is supplied.

In the current case, the evidence most favorable to Plaintiffs as the nonmoving party reveals that there are genu-

ine issues of material fact as to whether Dutchmen can be classified as a supplier under § 388 of the Restatement (Second) of Torts, whether Dutchmen supplied the scaffolding in furtherance of its own business purposes, whether Dutchmen knew or had reason to know that the scaffolding it gave to Keystone was or was likely to be dangerous for the use for which it was supplied, and whether Dutchmen had reason to believe that Keystone and its employees would realize the dangers of using the scaffolding, all of which go to the sufficiency of the alleged duty to warn.

12. In Count Two of their Complaint, Plaintiffs contend that Dutchmen was negligent per se when it operated the scaffolding at issue without an operating permit.... Indiana law requires an entity that installs or has control over the place of installation of a regulated lifting device to seek a permit prior to installation.

After a detailed review of designated evidence, the Court finds that there is no evidence to support Plaintiffs' contention that the scaffolding was a regulated lifting device as contemplated by Indiana Code § 22–12–1–22. Indeed, Plaintiffs' own evidence suggests that the scaffolding at issue was intended to be a work area. The Indiana statute requiring an applicant to seek a permit for installing a regulated lifting device does not apply to the scaffolding in this case.

For all the foregoing reasons, it is Ordered, adjudged and Decreed that Defendant Dutchmen's Motion for Summary Judgment is hereby Granted, in part, with respect to Plaintiffs' negligence per se claim and all theories of negligence asserted by Plain-

tiffs except for Plaintiffs' Restatement (Second) of Torts § 388 claim.

Appellant's App. p. 26–35.

Thereafter, Dutchmen filed a supplemental motion for summary judgment addressing Reynolds's Section 388 claims. In particular, Dutchman alleged that the scaffolding was not a chattel, that Keystone was aware of the dangers of the scaffolding even though Dutchmen was not, and that Keystone had accepted the premises "AS IS." *Id.* at 467–80. The trial court subsequently denied Dutchmen's motion.

On interlocutory appeal, this court reversed and remanded the cause to the trial court with instructions that it enter summary judgment for Dutchmen on all theories. *Dutchmen Mfg., Inc. v. Reynolds,* 819 N.E.2d 529, 533 (Ind.Ct.App.2004). In determining whether the platforms were chattels for purposes of Section 388, we found that the "scaffolding had merged into the real estate at the moment that the lease expired without Dutchmen removing the scaffolding." *Id.* at 532. However, our Supreme Court granted transfer, reversed, and remanded the case for trial on Reynolds's Section 388 claim. *Dutchmen Mfg., Inc. v. Reynolds,* 849 N.E.2d 516 (Ind.2006) (*Dutchmen II* ). In particular, it was determined that

> [t]he evidence viewed in a light most favorable to Reynolds permits the inference that Dutchmen negligently welded the scaffolding, and also failed to conduct a reasonable inspection of the scaffolding and ensure adequate lubricant. This is sufficient to deny summary judgment on the ground that Dutchmen had no knowledge of the defect.

*Id.* at 523.

Following remand, the trial court bifurcated the liability and damage phases of the trial. At the jury trial, which commenced on July 9, 2007, Dutchmen moved

for a judgment on the evidence or directed verdict following Reynolds's presentation of his evidence. The trial court denied the motion, stating:

> Well, I'm going to deny the motion for directed verdict. There are some inferences here and—and I agree that the issue is one that is fairly narrow in some respects, but I think the jury can make some inferences and it should go to them at this point. So I'm going to ask the jury to come in and [we're] going to proceed with the next witness.

Appellant's App. p. 332.

On July 17, 2007, the jury returned a verdict on liability, finding that Dutchmen was 20% at fault and Keystone was 80% at fault. Following a trial on damages, the jury found that Reynolds's damages totaled $30 million, resulting in a verdict in favor of Reynolds and against Dutchmen in the amount of $6 million. Dutchmen now appeals.

## DISCUSSION AND DECISION

### I. Judgment on the Evidence

Dutchmen contends that the trial court erred in denying its motion for judgment on the evidence.[2] Specifically, Dutchmen claims that the motion should have been granted because Reynolds failed to present sufficient evidence that Dutchmen knew or had reason to know that the scaffold was dangerous, that Reynolds presented no evidence that Keystone would have acted differently if Dutchmen had informed it of the allegedly dangerous condition of the platform, and the evidence presented at trial demonstrated that Keystone was aware of the dangerous condition of the scaffolding.

 Reynolds counters that Dutchmen is attempting to relitigate on appeal an issue that our Supreme Court already resolved in *Dutchmen II.* Thus, Reynolds asserts that Dutchmen's claim is barred under the law of the case doctrine.

 We initially observe that the law of the case doctrine provides that an appellate court's determination of a legal issue binds both the trial court and the appellate court in any subsequent appeal involving the same case and substantially the same facts. *Pinnacle Media, L.L.C. v. Metro. Dev. Comm'n of Marion County,* 868 N.E.2d 894, 901 (Ind.Ct.App.2007), *trans. denied.* The purpose of the doctrine is to minimize unnecessary relitigation of legal issues once they have been resolved by an appellate court. *Luhnow v. Horn,* 760 N.E.2d 621, 625 (Ind.Ct.App.2001). Accordingly, all issues decided directly or by implication in a prior decision are binding in all further portions of the same case. *Keesling v. T.E.K. Partners, LLC,* 881 N.E.2d 1025, 1029 (Ind.Ct.App.2008). However, we also note that the law of the case doctrine "is a discretionary tool." *Hanson v. Valma M. Hanson Revocable Trust,* 855 N.E.2d 655, 662 (Ind.Ct.App. 2006). To invoke this doctrine, the mat-

---

**2.** Indiana Trial Rule 50, which is captioned as "judgment on the evidence (directed verdict)," provides in part that

 (A) Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict. A party may move for such judgment on the evidence[:]

 (1) after another party carrying the burden of proof or of going forward with the evidence upon any one or more issues has completed presentation of his evidence thereon; or

 (2) after all the evidence in the case has been presented and before judgment. . . .

ters decided in the earlier appeal must clearly appear to be the only possible construction of an opinion. Thus, questions not conclusively decided in the earlier appeal do not become the law of the case. *Id.* Moreover, statements that are not necessary in the determination of the issues presented are dicta, are not binding, and do not become the law of the case. *Id.*

In *Dutchmen II*, our Supreme Court determined that, based on the summary judgment record before the trial court at the time, there was a genuine issue of material fact precluding the entry of summary judgment in Dutchmen's favor. Indeed, no disputed factual issues in favor of either Dutchmen or Reynolds were decided in *Dutchmen II*. Therefore, Reynolds's argument that Dutchmen is merely attempting to relitigate an issue that must be barred under the law of the case doctrine is unavailing.

Notwithstanding our conclusion that Dutchmen's claim is not barred under the law of the case doctrine, we note that to prevail on a motion for a judgment on the evidence, the defendant must demonstrate that the plaintiff has failed to prove at least one element of his claim. *Dickison v. Hargitt,* 611 N.E.2d 691, 694 (Ind.Ct.App.1993). Also, if there is any probative evidence or reasonable inference to be drawn from the evidence or if there is evidence allowing reasonable people to differ as to the result, judgment on the evidence is improper. *Id.* The idea underlying this standard of review "is to guarantee a litigant's right to have conflicting evidence submitted to a jury for resolution." *Id.*

As noted above, Dutchmen argues that its motion for judgment on the evidence with regard to Reynolds's Section 388 claims should have been granted because Reynolds offered no evidence that Dutchmen knew or had reason to know that the platform was dangerous.

In resolving this issue, we first set forth the provisions of Section 388:

> [o]ne who supplies directly or through a third person a chattel for another to use is subject to liability ... for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Additionally, comment m to Section 388 provides that

> The fact that a chattel is supplied for the use of others does not of itself impose upon the supplier a duty to make an inspection of the chattel, no matter how cursory, in order to discover whether it is fit for the use for which it is supplied. Such a duty may be imposed because of the purpose for which the chattel is to be used by those to whom it is supplied. A manufacturer of a chattel may be under a duty to inspect the materials and parts out of which it is made and to subject the finished article to such an inspection as the danger involved in an imperfect article makes reasonable.

Liability under Section 388 may be predicated on constructive knowledge. *Dutchmen II,* 849 N.E.2d at 523. Constructive knowledge means that which the actor reasonably should have known under

all of the circumstances. *Dickison,* 611 N.E.2d at 696 n. 2. Moreover, constructive knowledge can be inferred from circumstantial evidence. *Id.*

In this case, it is apparent that both the quantity and quality of the evidence that Reynolds presented at trial regarding Dutchmen's lack of lubrication and maintenance of the scaffolding and the dangers associated with the platforms in accordance with Section 388 was even greater than that which our Supreme Court considered in *Dutchmen II* when the summary judgment order was at issue.

More specifically, Mosher testified that lubrication of the scaffolding had been withheld pursuant to the instructions of a senior manager at Dutchmen. Appellant's App. p. 21, 34, 122. And Dutchmen personnel did not perform any maintenance or inspection of the scaffolding. *Id.* at 34, 135–38, 205. Additionally, as discussed in more detail below, Reynolds presented evidence demonstrating that Dutchmen's managers and supervisors knew of the other defects in and dangers of the scaffolding, including the inferior plumbing pipe, the inboard weld, the overloading, and the employees' jumps onto the platform. *Id.* at 144, 172–73, 185, 220. In light of the above, the evidence that Reynolds introduced at trial was sufficient to establish that Dutchmen knew or had reason to know of the defects that rendered the platform and scaffolding hazardous. Thus, we reject Dutchmen's claim that Reynolds failed to present any evidence that Dutchmen knew or had reason to know of the platform's danger. As a result, we conclude that the trial court properly denied Dutchmen's motion for judgment on the evidence on this basis.

Additionally, while Dutchmen maintains that Reynolds failed to present any evidence that Keystone would have acted differently had Dutchmen informed it of the allegedly dangerous condition of the platform, this court has determined that there is a presumption that an adequate warning would have been followed had one been given. *Jarrell v. Monsanto,* 528 N.E.2d 1158, 1168 (Ind.Ct.App.1988). As discussed in greater detail below, the jury heard evidence that Keystone's personnel were cognizant of workplace safety and that its maintenance department responded promptly to safety concerns when they arose. Therefore, the trial court also properly denied Dutchmen's claim for a judgment on the evidence on this basis.

## II. *Instructions*

Dutchmen next argues that the verdict must be set aside because the jury was improperly instructed with regard to its purported duty to inspect the scaffolding and claims that Reynolds failed to produce evidence at trial establishing that Dutchmen knew or had reason to know that the scaffolding was or was likely to be dangerous. More specifically, Dutchmen contends that the trial court's error in instructing the jury resulted from its misunderstanding of: (1) comment m to Section 388 quoted above; (2) the distinction between Section 388 and other Restatement sections; and (3) the holding of our Supreme Court's opinion in *Dutchmen II.* As a result, Dutchmen claims that the final instructions were misstatements of the law and were not supported by the evidence.

In resolving this issue, we initially observe that the manner of instructing the jury lies within the sound discretion of the trial court, whose ruling will not be reversed unless an instructional error is such that, taken as a whole, the charge to the jury misstates the law or otherwise misleads the jury. *Town of Highland v. Zerkel,* 659 N.E.2d 1113, 1122 (Ind.Ct.App. 1995). Additionally, the instruction must

be a correct statement of the law, be applicable to the evidence adduced at trial, and be relevant to the issues that the jury must decide in reaching its verdict. *Id.*

Dutchmen contends that the trial court erred in giving the following instructions:

### INSTRUCTION 2

As part of the duty to disclose, Dutchmen also owed a duty to Keystone to conduct proper inspection of the finished scaffolding which would disclose the existence of a dangerous condition.

This included inspecting the materials and parts out of which the scaffolding was made and conducting a reasonable inspection of the finished scaffolding.

You should consider this duty to inspect when determining whether Dutchmen failed to exercise reasonable care to inform Keystone of the dangerous condition or of the facts which made it likely to be dangerous.

### INSTRUCTION 3

As part of this duty to disclose, Dutchmen also owed a duty to Keystone to conduct proper inspection of the finished scaffolding which would disclose the existence of a dangerous condition.

This included inspecting the materials and parts out of which the scaffolding was made and conducting a reasonable inspection of the finished scaffolding.

You should consider this duty to inspect when determining whether Dutchmen failed to exercise reasonable care to inform Keystone of the dangerous condition or of the facts which made it likely to be dangerous.

If you are convinced by a preponderance of the evidence that Dutchmen failed to exercise reasonable care to inform Keystone of the dangerous condition or of the facts which made it likely to be

dangerous, then you should find that Dutchmen was negligent.

Appellant's App. p. 275, 373.

In addressing Dutchmen's contentions, we note that comment m under Section 388 makes it clear that merely because a chattel is supplied for the use of others, that a circumstance does not "of itself" impose a duty upon the supplier to inspect the chattel. However, the comment also provides that such a duty "may be imposed because of the purpose for which the chattel is to be used by those to whom it is supplied." Finally, "a manufacturer of a chattel may be under a duty to inspect the materials and parts out of which it is made and to subject the finished article to such an inspection as the danger involved in an imperfect article makes reasonable." In construing the provisions of Section 388 and its comments, the *Dutchmen II* court observed that

section 388 imposes liability on a supplier of a chattel for physical harm caused by the supplier's "failure to exercise reasonable care" to provide to any expected user of the chattel any information as to the "character and condition of the chattel ... which [the supplier] should recognize as necessary to enable [the user] to realize the danger of using it." Restatement (Second) Torts § 388 cmt. b. A supplier of a chattel has no duty to warn of an obvious hazardous condition which a "mere casual looking over will disclose." *Id.* at cmt. K; R.D. Hursh, *Manufacturer's or Seller's Duty to Give Warning Regarding Product as Affecting His Liability for Product–Caused Injury,* 76 A.L.R.2d 9, 28, 1961 WL 13170 (1961). Moreover, a supplier is not required "to warn a person who in his occupation or profession regularly uses the product against any risk that should be known to such a regular user." 63 Am.Jur.2d *Products Liability* § 51,

at 61 (1972). However, in *McGlothlin* [*v. M & U Trucking, Inc.,* 688 N.E.2d 1243 (Ind.1997)], we held that section 388 imposes a duty on the supplier of a chattel to conduct a proper inspection which would disclose the existence of a defect. 688 N.E.2d at 1245. Comment m of section 388 states that subsection (c) of that section imposes a duty on the supplier to inspect the materials and parts out of which the chattel is made and conduct a reasonable inspection of the finished chattel.

849 N.E.2d at 522.

 Notwithstanding Dutchmen's claim that the trial court misconstrued the holdings in *Dutchmen II* and *McGlothlin,* we reject its contention that there was no basis for the trial court to instruct the jury that Dutchmen had a duty to inspect the platform. On the other hand, we note that our Supreme Court has not sought to paint Section 388 so broadly as to imply that *any* supplier of a chattel under every circumstance has a duty to inspect a chattel that would reveal the existence of a defect. For instance, a plumbing supply company that receives sealed cartons containing water heaters from the manufacturer, which subsequently sells the product to consumers or retailers, may very well be under no duty to inspect under Section 388 so long as the supplier has no reason to know that the product is dangerous. Thus, our interpretation of Section 388 in accordance with *McGlothlin* and *Dutchmen II* stands for the proposition that a supplier who knows or has reason to know of the danger of a chattel is under a duty to inspect. As a result, we are not saying that the typical supplier without knowledge of a defect has a duty to inspect. Thus, as discussed above, our Supreme Court in *Dutchmen II* observed that the facts most favorable to Reynolds, the nonmoving party, established that there was a duty to inspect

because the designated evidence demonstrated that Dutchmen had negligently welded the scaffolding and failed to conduct a reasonable inspection of the platform and ensure adequate lubricant. 849 N.E.2d at 523.

Also, contrary to Dutchmen's contentions, we observe that the evidence presented at trial indeed established that Dutchmen failed to inspect the scaffolding. Moreover, the record reflects that Dutchmen had actual knowledge that inexperienced personnel constructed the scaffolding from plumbing pipe, failed to maintain the scaffold without adequate lubrication, and failed to inform Keystone of the inherent dangers of the scaffold. Specifically, the evidence showed that Mosher chose plumbing pipe for the scaffolding, and Dutchmen's safety expert conceded that its managers would have known that the material was plumbing pipe rather than tubing that should have been used in the construction. Appellant's App. p. 144, 220. Although Mosher had copied the scaffolding that was constructed at Maple City in another plant, he testified that he did not know the difference between the piping that was used and proper structural tubing that should have been used. *Id.* at 40.

According to Reynolds's engineering expert, Keystone personnel could not have discerned that plumbing pipe was used on the scaffolding rather than appropriate structural tubing. Specifically, he testified that very little of the inner pipe would have been visible to Keystone personnel because of the encasement of the piping in the vertical arm, outer tube, and end cap. *Id.* at 277.

The evidence also demonstrated that when the scaffold was completed, one of Dutchmen's workers, who lacked any engineering experience, conducted a simple "test run" of the scaffold by "running the hoist up and down" in order to make sure

that the unit "cleared underneath it." *Id.* at 40. In other words, Dutchmen never inspected its scaffolding. *Id.* at 9.

Reynolds also presented evidence that the weld at the intersection of the inboard side of the pipe and vertical arm that weakened the scaffold was "unnecessary" and it was concealed from view by the outer tubing. *Id.* at 185–338. Moreover, Reynolds's expert testified that Keystone personnel would not have been able to see that the support arm lacked necessary lubrication, as there was nothing about the scaffold's support arm that would have alerted Keystone to that fact. *Id.* at 205.

Although it was established that Dutchmen's maintenance workers could have lubricated the scaffolding by applying grease "between the inner pipe and outer tube," *id.* at 205, Mosher's supervisor, who was also Dutchmen's production manager, instructed Mosher not to lubricate because the grease could drip and soil the trailers that were parked below. *Id.* at 34.

Reynolds also presented evidence regarding the overloading and misuse of the platforms. Each scaffold platform weighed nearly 580 pounds, excluding the weight of the workers and their tools. *Id.* at 202, 256–59, 274, 396–97. It was suspended over a confined workspace above the heads of production workers who, at regular intervals, walked directly underneath it several times per day. *Id.* Mosher knew that the scaffolds were designed to hold two workers but, as discussed above, there were instances where he noticed three and sometimes four employees on them at once. *Id.* at 137. Mosher and others also saw workers jump from three to five feet onto the platforms, which caused the building to shake. *Id.* at 31, 103, 136. As a result of such conduct, Dutchmen's managers issued an order prohibiting the jumping. *Id.*

The jury also heard evidence regarding Dutchmen's experience in constructing other scaffolding platforms. More specifically, it was established that Dutchmen's maintenance personnel had outfitted four other facilities with similar scaffolding when Mosher and Pfeiffer built the scaffolds for the Maple City plant. In light of Dutchmen's level of technical expertise as a manufacturer of RVs and its experience in working with metal tubing in the design and fabrication of scaffolds, the evidence established that Dutchmen should have at least known that using plumbing pipe, making no provision for lubrication, overloading and jumping, and the defective welding of the support arm, would render the scaffold unsafe as a platform in accordance with the requirements of Section 388.

Additionally, there is no indication that Keystone personnel could have known that Dutchmen had overloaded the scaffold or permitted its employees to jump on the platforms. Moreover, Keystone could not have discerned that the inner tube was plumbing pipe or that the inner weld was defective because both were hidden from view. Although Dutchmen contends that Keystone knew that the scaffold was made from plumbing pipe, the evidence established that it would not have been possible for Keystone to determine that the inner pipe was constructed of that material because too little of it was available to measure accurately. *Id.* at 170–74. Moreover, even though there was evidence that scaffolds had been built for Keystone with "schedule 40" pipe, there was no testimony that the same type had been used as with the Dutchmen scaffolding. *Id.* at 135–36. Finally, there was no evidence that Keystone knew or could have known that the scaffold had not been lubricated for years. *Id.* at 205–07.

In sum, the evidence established that Dutchmen had actual and constructive knowledge of the defect that rendered the scaffolding hazardous, Dutchmen had no reason to know that Keystone was likely to discover the defects, and Dutchmen failed to exercise reasonable care to inform Keystone of the scaffolding's dangerous condition in accordance with Section 388. Moreover, given the evidence demonstrating that Dutchmen failed to inspect the scaffolding in accordance with Section 388 and the holding in *Dutchmen II*, we conclude that the trial court's instructions were proper.[3]

### III. Mistrial

■ Dutchmen maintains that the trial court erred in denying its motion for a mistrial. Specifically, Dutchmen argues that "Reynolds's counsel improperly inflamed the passions of the jury and violated established rules of trial conduct" by making certain comments about discovery responses and available defenses. Appellant's Br. p. 38. Dutchmen contends that Reynolds's counsel accused it "of sinister motives, and inviting the jury to punish Dutchmen and render a verdict based upon passion and prejudice." *Id.* at 15. As a result, Dutchmen clams that the jury "likely rendered a damage award outside the bounds of the evidence." *Id.*

■ In resolving this issue, we note that this court will reverse a judgment due to improper argument of counsel only where it appears from the entire record that the remarks from counsel were "in all probability, the basis for securing an incorrect verdict." *Ritter v. Stanton,* 745 N.E.2d 828, 857 (Ind.Ct.App.2001). Here, Dutchmen contends that Reynolds's counsel's comment in his opening statement at the damages phase of the trial that Reyn-

olds would receive only 20% of the damages award and that Reynolds would have to repay a worker's compensation lien from this amount improperly informed the jury that Keystone was "immune from liability." Appellant's Br. p. 39.

Reynolds's counsel commented as follows:

> Because after you make that pie, then that 20 percent is what he's going to get from this case. That's the piece that he's going to get, and that's going to have to take care of him.

Appellant's App. p. 378. After Dutchmen objected to these comments, Reynolds's counsel offered the following explanation to the trial court at a sidebar conference:

> Judge, I was saying that in the context of [Reynolds] being totally, permanently disabled. If he can't work, he has no stream of income. I've been making that point for ten minutes. In fact, if he can't work then the jury's award is going to have to take care of him; and therefore I was not making reference to the immunity. . . .

*Id.* at 382.

Just prior to Dutchmen's objection, Reynolds's counsel had described his client's need for ongoing care and his inability to gainfully support himself. *Id.* at 221–23. And, following the sidebar conference in an attempt to avoid confusion, the trial court instructed the jury that it should determine the total amount of damages and should "not be influenced by the fact that there may be 20 percent out there or more to take care of him." *Id.* at 389. Thus, we reject Dutchmen's assertion that the statements by Reynolds's counsel rose to a level of misconduct and

---

**3.** Interestingly, it may not intellectually follow that liability under Section 388 should attach as to *both* Dutchmen and Keystone in these

circumstances. However, no objection was made and the issue is not before us in this appeal.

were "designed to avoid the evidence and obtain a verdict multiple times larger that what otherwise would be awarded based on the evidence." Appellant's Br. p. 41.

■ Dutchmen also argues that Reynolds's counsel improperly informed the jury that Reynolds must repay a worker's compensation lien from the twenty percent of any verdict that is awarded. Dutchmen claims that this statement was a misstatement of the law because it suggested that Reynolds would have to repay the entire amount of the lien contrary to the provisions of Indiana Code section 34–51–2–19, which provides that liens arising from the payment of medical expenses or other benefits are reduced proportionately to comparative fault. Appellant's Br. p. 39.

Notwithstanding Dutchmen's contention, Reynolds's counsel stated:

> You're going to hear evidence of what's called a lean [sic] and you're going to proceed with details of that in this trial. When Chad was injured at Keystone, it was a work related injury and so Keystone paid worker's compensation benefits and there is a lean [sic] as to the amount of money paid by Keystone.

Appellant's App. p. 393. Moreover, the trial court instructed the jury that "should you award damages to … Reynolds, … he will be required under Indiana Law to repay two thirds (2/3rds) of the foregoing benefits to Keystone's worker's compensation insurance carrier. Should you not award damages, he will have no obligation to repay this amount." Appellee's App. p. 2. When considering the statement by Reynolds's counsel and the instruction that the trial court gave with regard to this issue, we reject Dutchmen's claim that the statement was "legally wrong" and entitled it to a mistrial. Appellant's Br. p. 40.

■ Dutchmen also argues that the comment made by Reynolds's counsel that the jury should punish and "send Dutchmen a message" amounted to misconduct and warranted a mistrial. Appellant's App. p. 370–71. In essence, Dutchmen contends that the remark caused the jury to decide the issue of liability on the basis of passion and prejudice.

Following Dutchmen's objection to the comment, the trial court admonished the jury to disregard the statement. *Id.* at 371. Moreover, the jury ultimately assigned 80% fault to Keystone and 20% fault to Dutchmen. Hence, it is not likely that the remark caused the jury to abandon a reasoned analysis and decide the issue of fault on the basis of passion. Rather, it is apparent that the jury heard and considered the evidence and based its verdict and apportionment of fault upon that evidence. Therefore, the statement did not amount to reversible error, and we conclude that the trial court properly denied Dutchmen's motion for a mistrial with regard to this issue.

■ Finally, Dutchmen contends that Reynolds's counsel's challenge to the alleged adequacy of an interrogatory answer regarding Dutchmen's purported refusal to identify the cause of the platform failure warranted the granting of a mistrial. Dutchmen claims that Reynolds's counsel "inferentially accused Dutchmen of discovery misconduct," which should have resulted in a mistrial. Appellant's Br. p. 41.

During the opening statement in the liability phase of the trial, Reynolds's counsel conveyed to the jury that Dutchmen refused to answer the interrogatory that asked it to identify the cause of the platform failure. Appellant's App. p. 116. Counsel pointed out that Dutchmen was asked to state "specifically how [Keystone's] alleged failure to maintain the scaffold caused or contributed to" Reynolds's injuries. *See id.* at 50–64. Dutchmen answered the interrogatory by refer-

encing its answer to a prior interrogatory, which focused on Dutchmen's contention that Keystone had been negligent in inspecting the scaffold. *Id.* at 59.

After discussing Dutchmen's alleged failure to respond to the interrogatories regarding causation, Reynolds's counsel stated that he "had received a report on June 18, 2007," which concluded that the "D-ring" on the scaffolding had failed. *Id.* at 96–99. Thus, because Dutchmen did not reference the alleged failure of the D–Ring in its answers to the interrogatories, it maintains that the remarks by Reynolds's counsel improperly conveyed to the jury that it had lied in its discovery responses implying that Dutchmen "maliciously [sprung] its theory of causation on Mr. Reynolds." Appellant's Br. p. 42.

Notwithstanding Dutchmen's claim, we cannot agree that Reynolds's counsel was implying that Dutchmen had engaged in discovery abuse and was attempting to conceal anything from Reynolds. Moreover, the trial court specifically admonished Reynolds's counsel that it was not going to allow him "to suggest [that Dutchmen was] hiding something" in light of the interrogatory responses. Appellant's App. p. 113. In our view, Reynolds's counsel merely commented on the interrogatory responses to show that Dutchmen had adopted its D-ring failure defense at some later point. In short, those remarks failed to demonstrate that Reynolds's counsel was accusing Dutchmen of engaging in discovery misconduct. Thus, we conclude that the trial court did not err in denying Dutchmen's motion for a mistrial on this basis.

#### IV. Damage Award

 Finally, Dutchmen argues that the damage award must be set aside. Specifically, Dutchmen claims that a $30 million damage award was excessive because Reynolds "only presented evidence of approximately $10 million in damages." Appellant's Br. p. 46.

 When reviewing a damage award, we consider only the evidence that supports the award along with the reasonable inferences therefrom. *Ritter*, 745 N.E.2d at 843. A damage award will be upheld if it falls within the bounds of the evidence. *City of Carmel v. Leeper Elec. Servs., Inc.*, 805 N.E.2d 389, 393 (Ind.Ct. App.2004). The jury has broad discretion in determining an award of damages, and when the evidence is conflicting, the jury is in the best position to assess the damages. *Ritter*, 745 N.E.2d at 844. In other words, if the award is within the scope of the evidence and can be explained on any reasonable ground, the award will not be deemed the result of improper considerations. *Id.* However, if "the damage award is so outrageous as to indicate the jury was motivated by passion, prejudice, partiality, or consideration of improper evidence, we will find the award excessive." *Id.* Finally, the jury's damage award will not be deemed the result of improper considerations if the size of the award can be explained on any reasonable ground. *Id.* at 857.

In this case, Reynolds presented testimony of medical, vocational, and life care planning experts in support of his claim for damages. Specifically, Dr. Aashish Deshpande testified that Reynolds suffered a spinal cord injury in the accident that resulted in permanent partial quadriplegia. Indeed, Reynolds is paralyzed below the chest, is totally disabled with a 76% loss of whole body function, and is wheelchair bound. Reynolds also has a total loss of bladder and bowel function, is catheter dependent, and has suffered a loss of sexual function. Appellee's App. p. 45–72.

At the time of trial, the evidence demonstrated that Reynolds had incurred medi-

cal expenses totaling $979,832.23, and his future medical costs were estimated at $8,270,433.88. The evidence further established that Reynolds's pretrial wage loss is $283,912.12 and his future wage loss is $1,012,284. *Id.* at 304. Reynolds also faces additional medical complications that may include heart disease, pneumonia, and depression. *Id.* at 58–65.

Reynolds, his wife, and his brother testified at trial and described the extent of Reynolds's injuries and their effects on his life. It was established that Reynolds requires non-skilled custodial care for transfers from his wheelchair to his bed or to the shower. Every morning at approximately 3:00, a caretaker must reposition Reynolds in bed to prevent the formation of pressure sores that could be life-threatening. Tr. p. 1404–06.

In sum, the record is replete with evidence of Reynolds's devastating injuries, permanent disabilities, continuing pain and suffering, wage loss, and loss of consortium. We see no indication that the jury acted out of prejudice, passion, or partiality. Although the amount of the award in this case is sizeable, we cannot conclude that it is outrageous in light of the evidence that was presented. Thus, we decline to disturb the jury's verdict.

The judgment of the trial court is affirmed.

KIRSCH, J., and BAILEY, J., concur.